*Nowakowski v. New York*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term 2015

(Argued: October 14, 2015        Decided: August 26, 2016)

Docket No. 14-1964

ROBERT NOWAKOWSKI,

*Petitioner-Appellant*,

–v.–

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent-Appellee.*

————————

Before:

STRAUB, WESLEY, and LIVINGSTON, *Circuit Judges*.

Appeal from a May 30, 2014, order of the United States District Court for the Eastern District of New York (Vitaliano, *J.*).  Petitioner-Appellant Robert Nowakowski filed a petition for habeas relief under 28 U.S.C. § 2254 from a

conviction for second-degree harassment. Because Nowakowski completed his sentence of conditional discharge, the District Court dismissed the petition as moot, concluding there was no continuing collateral consequence sufficient to confer standing. We granted a certificate of appealability to address two questions of first impression in our Circuit: (1) whether Nowakowski was "in custody" for the purposes of habeas review when he filed his petition during a period of conditional discharge requiring one day of community service; and (2) whether, despite the completion of that sentence, there are collateral consequences to his conviction. We conclude that Nowakowski was both "in custody" at the time his petition was filed and that, because the presumption of continuing collateral consequences applies to his conviction and is not rebutted, his petition presents a live case or controversy. We therefore VACATE the district court's dismissal of Nowakowski's habeas petition and REMAND for further proceedings.

Judge LIVINGSTON dissents in a separate opinion.

————————————

ROBERT NOWAKOWSKI, *pro se*, Brooklyn, NY.

VICTOR BARALL, Assistant District Attorney (Leonard Joblove, Assistant District Attorney, *on the brief*), for Kenneth P. Thomson, District Attorney for Kings County, Brooklyn, NY, *for Respondent-Appellee.*

————————————

WESLEY, *Circuit Judge*:

Petitioner-Appellant Robert Nowakowski was convicted of harassment in the second degree, an offense classified as a violation under state law, and sentenced to one year's conditional discharge, requiring one day of community service. Before completing this sentence, Nowakowski filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for

2

the Eastern District of New York (Vitaliano, *J.*).  Because Nowakowski fulfilled

the requirements of his sentence during the pendency of the habeas proceeding,

the District Court concluded that Nowakowski's case presented no live case or

controversy sufficient to establish Article III standing under *Spencer v. Kemna*, 523

U.S. 1 (1998).

We granted a certificate of appealability with instructions to brief two

questions of first impression we now answer:  *First*, whether a sentence of

conditional discharge and one day's community service, unfulfilled as of the

time of filing the habeas petition, satisfies the "in custody" requirement of § 2254.

And *second*, whether a presumption of continuing collateral consequences

applies to Nowakowski's conviction, thus presenting a live case or controversy

under Article III despite the expiration of his sentence.  Because we answer both

questions in the affirmative, we VACATE the District Court's dismissal of

Nowakowski's petition and REMAND for further proceedings consistent with

this opinion.[1]

---

[1] We reject Nowakowski's arguments that his case should be reassigned to a different judge.  The principal basis upon which Nowakowski challenges Judge Vitaliano's impartiality is his judicial rulings, which "alone almost never constitute a valid basis for a bias or partiality motion."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  Political contributions received by Judge Vitaliano when he served in elected office—more than five years prior to his confirmation as a federal judge and more than twelve years prior

## BACKGROUND[2]

Robert Nowakowski was arrested on October 31, 2006, on charges of assault against another tenant in his building. He contends that these charges were fabricated by his landlord and his neighbors, including the now-deceased victim. After a bench trial, he was convicted of harassment in the second degree—which is classified as a violation under New York state law—in the Criminal Court of the City of New York on September 18, 2008, and ordered to pay a fine of $100. The sentence was stayed for over four years during post-conviction appeals and collateral proceedings. On May 14, 2013, the Criminal Court vacated the fine and sentenced Nowakowski to a one-year conditional discharge, requiring him to complete one day of community service within that time. This change in sentence occurred at Nowakowski's request because he could not afford the fine and administrative charges, which totaled $195.

---

to Nowakowski's petition—are not the "unusual circumstances where . . . an assignment to a different judge is salutary and in the public interest." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc) (per curiam) (internal quotation marks omitted).

[2] Unless otherwise noted, the following facts are taken from the parties' briefing and are undisputed.

Pursuant to the amended sentence, the Kings County District Attorney's Office sent Nowakowski a "Notice of C.S. Obligation," dated June 6, 2013. This notice informed Nowakowski that he had been referred for community service on July 2, 2013, with the Parks Department. It informed him that he was required to appear on that date in a specific location, that the date would "NOT be rescheduled," and that if he failed to appear or complete the required service, "a warrant may be issued for [his] arrest." Appellant App. 18.[3]

On July 1, 2013, Nowakowski filed a petition under 28 U.S.C. § 2254 for habeas relief. He then appeared and completed his community service before appearing in the Criminal Court on July 9, 2015, with proof of completion.[4] Prior to filing his federal habeas petition, Nowakowski had filed a *pro se* civil complaint in the United States District Court for the Eastern District of New York, alleging violations of 42 U.S.C. § 1983 by arrest and imprisonment without probable cause, assault and excessive force, and the state tort of malicious abuse of process. *See* Second Am. Compl., *Nowakowski v. City of New York et al.*, No.

---

[3] As Nowakowski's appendix lacks global pagination, our citations use the PDF pagination as available on this Court's electronic docket (ECF No. 34).

[4] Nowakowski states he completed the service as ordered on July 2. *See* Appellant Br. 6. The People disclaim knowledge of the specific date but agree that, in any event, the community service was completed after July 1 and before July 9. *See* Appellee Br. 6.

1:08-cv-00399-RJD-LB (E.D.N.Y. filed May 19, 2008), ECF No. 17.  His civil action remains stayed pending resolution of his federal habeas proceeding.

On November 7, 2013, the District Court initially dismissed Nowakowski's petition without prejudice, because it contained an unexhausted claim of ineffective assistance of appellate counsel.  Nowakowski both moved to vacate the dismissal, stating he wished to delete his unexhausted claim and proceed only on his exhausted claims, and filed a motion in our Court for a certificate of appealability.  We construed the motion as one for remand to the District Court for consideration of his Rule 59(e) motion and granted it.  On April 2, 2014, the District Court reopened Nowakowski's case and granted Nowakowski's motion for reconsideration, allowing his exhausted claims to proceed.

Following briefing, the District Court concluded that the expiration of Nowakowski's conditional discharge on May 14, 2014, rendered his petition moot, unless Nowakowski could demonstrate a continuing collateral consequence under *Spencer*, *supra*.  Nowakowski argued that his conviction would preclude his § 1983 action from proceeding under *Heck v. Humphrey*, 512 U.S. 477 (1994); the District Court held that *Spencer* rejected this argument against mootness as an insufficient collateral consequence.  Thus, the District Court

entered a Memorandum and Order on May 30, 2014, dismissing the petition as moot and denying a certificate of appealability. Nowakowski moved for a certificate of appealability in this Court, which we granted. *See* Order, *Nowakowski v. New York*, No. 14-1964 (2d Cir. Dec. 8, 2014), ECF No. 21.

## DISCUSSION

We review *de novo* a district court's denial of a § 2254 petition, including whether a petitioner was in custody at the time of filing, *see Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011), and whether his petition is moot, *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 50–51 (2d Cir. 2004). As Nowakowski briefed and argued this case *pro se*, we construe his "appellate briefs and submissions liberally and interpret them to raise the strongest arguments they suggest." *Wright v. Comm'r*, 381 F.3d 41, 44 (2d Cir. 2004).

## I.

The first question we must decide is whether Nowakowski was "in custody" and thus able to seek federal habeas relief.[5] In order for a federal court to have jurisdiction over a habeas petition, the petitioner must be "in custody

---

[5] Though the question of custody was not argued by the People below nor decided by the District Court, the requirement of custody is jurisdictional, *see Ogunwomoju v. United States*, 512 F.3d 69, 75 (2d Cir. 2008), and thus, we have an obligation to consider it *nostra sponte*, *see Soto v. United States*, 185 F.3d 48, 51 (2d Cir. 1999).

pursuant to the judgment of a State court" at the time the petition is filed. 28

U.S.C. § 2254(a); *Maleng v. Cook*, 490 U.S. 488, 490–91 (1989).

Despite the "chief use of habeas" being "the release of persons held in

actual, physical custody in prison or jail," the Supreme Court has affirmed "that,

besides physical imprisonment, there are other restraints on a man's liberty,

restraints not shared by the public generally, which have been thought sufficient

in the English-speaking world to support the issuance of habeas corpus." *Jones v.*

*Cunningham*, 371 U.S. 236, 240 (1963); *see also id.* at 238. The *Jones* Court found

jurisdiction where an individual was released from imprisonment on parole

subject to explicit conditions—for example, regular reporting to his parole

officer; remaining in a particular community, residence, and job; and refraining

from certain activities. *Id.* at 242. The Supreme Court has likewise found

jurisdiction where a petitioner was released on his own recognizance prior to

trial but had to appear in criminal court when ordered and where failure to do so

would result in issuance of an arrest warrant. *See Hensley v. Mun. Court, San Jose-*

*Milpitas Judicial Dist.*, 411 U.S. 345, 351 (1973); *see also Justices of Bos. Mun. Court v.*

*Lydon*, 466 U.S. 294, 300–01 (1984) (finding jurisdiction over petitioner released on

his own recognizance prior to trial "subject to the conditions that he would

appear when ordered by the court, that he would waive extradition if he was apprehended outside the State, and that a court could revoke the order of release and require that he be returned to confinement or post bail").

The Courts of Appeals, including ours, have recognized that a variety of nonconfinement restraints on liberty satisfy the custodial requirement. *See, e.g.*, *Earley v. Murray*, 451 F.3d 71, 75 (2d Cir. 2006) (post-release supervision); *Barry v. Bergen Cty. Prob. Dep't*, 128 F.3d 152, 160–62 (3d Cir. 1997) (500 hours of community service); *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 894–95 (2d Cir. 1996) (banishment from tribal land); *Dow v. Circuit Court of First Circuit Through Huddy*, 995 F.2d 922, 923 (9th Cir. 1993) (per curiam) (mandatory fourteen-hour alcohol rehabilitation program); *Sammons v. Rodgers*, 785 F.2d 1343, 1345 (5th Cir. 1986) (per curiam) (unexpired suspended sentence); *United States ex rel. B. v. Shelly*, 430 F.2d 215, 217 n.3 (2d Cir. 1970) (probation). Those cases where courts have declined to find the petitioners sufficiently "in custody" have typically involved the imposition of fines or civil disabilities, such as suspension of licenses. *See, e.g.*, *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997) (restitution); *United States v. Michaud*, 901 F.2d 5, 7 (1st Cir. 1990) (per curiam) (monetary fine); *Lefkowitz v. Fair*, 816 F.2d 17, 20 (1st Cir. 1987) (suspension of

9

medical license); *Lillios v. New Hampshire*, 788 F.2d 60, 61 (1st Cir. 1986) (per curiam) (fine and temporary suspension of driver's license); *Ginsberg v. Abrams*, 702 F.2d 48, 49 (2d Cir. 1983) (per curiam) (revocation of law, real estate, and insurance licenses); *see also Maleng*, 490 U.S. at 492 (collateral consequences of a completed sentence do not constitute custody).

The custody inquiry therefore "requires a court to judge the 'severity' of an actual or potential restraint on liberty." *Poodry*, 85 F.3d at 894. Though the language of habeas cases often refers to "severe restraints on individual liberty" or "cases of special urgency," *Hensley*, 411 U.S. at 351, these terms describe the nature, rather than the duration, of the restraint. It is evident that a single day of incarceration would be sufficient custody for jurisdiction if the petitioner filed while subject to such a sentence. Similarly, courts have considered even restraints on liberty that might appear short in duration or less burdensome than probation or supervised release severe enough because they required petitioners to appear in certain places at certain times, thus preventing them from exercising the free movement and autonomy available to the unrestricted public, or exposed them to future adverse consequences on discretion of the supervising court. *See id.* (custody satisfied where petitioner was required to appear in court

when ordered and subject to revocation of release); *Barry*, 128 F.3d at 161 (despite flexibility in scheduling, requirements "to be in a certain place—or in one of several places—to attend meetings or to perform services" are clearly "restraints on [petitioner's] liberty not shared by the public generally"); *Dow*, 995 F.2d at 923 (mandatory class attendance and "physical presence at a particular place" constituted custody, despite lasting only fourteen hours over three days); *Sammons*, 785 F.2d at 1345 (potential of revocation of suspended sentence or other adverse action during term sufficient for custody).

With these examples in mind, we turn to the facts before us, which are uncontested. Although the Criminal Court initially imposed a fine of $100, it vacated this sentence and replaced it with a one-year conditional discharge and an order that Nowakowski perform one day of community service. At the time of the petition's filing, therefore, the Criminal Court required Nowakowski (1) to complete a day of community service (2) by a particular date and (3) to report to the Criminal Court upon completion of that service. Pursuant to these requirements, Nowakowski received a "Notice of C.S. Obligation" from the Kings County District Attorney. The Notice commanded that Nowakowski appear at a particular location at a particular time on a particular day, and

11

informed him that he had no opportunity to reschedule the date and that failure to appear could result in the issuance of a bench warrant. In addition, during the one-year term of his sentence—which lasted for nine months after his petition was filed—the Criminal Court retained jurisdiction to modify or enlarge the conditions of, or to revoke entirely, the conditional discharge. *See* N.Y. PENAL LAW § 65.05[2].

Nowakowski's sentence falls within the category of restraints that satisfy the statutory requirement of custody.[6] These restrictions are "not shared by the public generally," *Jones*, 371 U.S. at 240, require Nowakowski's physical presence at particular times and locations, both for community service and court appearances, *see Barry*, 128 F.3d at 161; *Dow*, 995 F.2d at 923, and carry with them the potential for future adverse consequences during the term of the sentence,

---

[6] The People contend that Nowakowski should be estopped from claiming federal habeas relief since his sentence was converted from a fine to conditional discharge at his request. They base this argument on two propositions: that Nowakowski viewed conditional discharge and community service as less onerous than the fine, and that his request was a strategic attempt to qualify himself for federal habeas relief. We find no support for these conclusions in the record. Nowakowski has put forth the reason for his request—indigence, a rationale the Criminal Court accepted by entering a new sentence. Further, it stretches credulity that a convicted defendant would voluntarily seek a sentence that subjects him to objectively *increased* restraint solely to gain mere access to—not relief in—federal habeas proceedings. The People have also presented no law supporting a theory of estoppel applied to access to federal habeas, and we decline to create any now.

including arrest for noncompliance and modification or revocation of the conditional discharge,[7] *see Hensley*, 411 U.S. at 351; *Sammons*, 785 F.2d at 1345. They are wholly unlike the economic penalties suffered in fine-only or license-revocation sentences, where the punishments "implicate only property, not liberty." *Barry*, 128 F.3d at 161. Consequently, we conclude that, at the time the petition was filed, Nowakowski was "in custody" within the meaning of § 2254.

## II.

The second question we must answer is whether Nowakowski's case is moot. Unlike the "in custody" requirement, mootness is not fixed at the time of filing but must be considered at every stage of the habeas proceeding. *See Carafas v. LaVallee*, 391 U.S. 234, 237 (1968). Once, as here, a petitioner's sentence has expired, "some concrete and continuing injury other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained." *Spencer*, 523 U.S. at 7. In *Spencer*, the Court conducted a two-step analysis: *First*, the Court determined whether a

---

[7] That the Criminal Court could have revoked the conditional discharge if Nowakowski committed "an additional offense," N.Y. PENAL LAW § 65.05[2], was a particularly broad vulnerability. An "offense" under New York law, as we discuss more extensively *infra* at Part II.A, is "conduct for which a sentence to a term of imprisonment or to a fine is provided" by state or local law, ordinance, or regulation—everything from a traffic infraction to a felony. N.Y. PENAL LAW § 10.00[1]–[5].

13

presumption of "continuing collateral consequences" should apply. *Id.* at 8.

And *second*, the Court determined whether, applying the presumption or not,

there was sufficient evidence that such consequences in fact existed. *Id.* at 14;

*accord United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999). We conduct

each inquiry in turn.

**A.**

*Spencer* traced more than forty years of Supreme Court precedent to

explain the development of the presumption of continuing collateral

consequences after its first articulation in *Sibron v. New York*, 392 U.S. 40 (1968).

The Court observed that it applied the presumption only to "criminal

convictions" and expressly declined to extend it outside of that context to parole

revocation. *Spencer*, 523 U.S. at 9–13; *see also Lane v. Williams*, 455 U.S. 624, 632–33

(1982). In so doing, it candidly acknowledged that such a presumption "sits

uncomfortably beside the long-settled principle" that Article III standing cannot

be inferred and that the proponent of jurisdiction bears the burden of

demonstrating it. *Spencer*, 523 U.S. at 10–11 (internal quotation marks omitted).

It further considered "of particular relevance" that, with criminal convictions,

"the presumption of significant collateral consequences is likely to comport with

14

reality," calling this observation "'an obvious fact of life.'" *Id.* at 12 (quoting

*Sibron*, 392 U.S. at 55). The Court's clear reluctance to extend the *Sibron*

presumption outside of this narrow category has guided our Court in declining

to apply it when the defendant does not challenge a criminal conviction. *See*

*Mercurris*, 192 F.3d at 293 (sentencing enhancement); *United States v. Probber*, 170

F.3d 345, 348 (2d Cir. 1999) (revocation of supervised release).

*Spencer*—as well as our opinions in *Mercurris* and *Probber*—may be fairly

characterized as declining to apply the presumption to cases in which something

ancillary to a conviction was challenged, even if of a criminal nature.[8] Here, by

contrast, it is evident that Nowakowski challenges a conviction. What is

disputed is whether this conviction is criminal, for reasons that will shortly

become clear. Our Circuit's precedent has never answered this question, nor has

the Supreme Court spoken on the subject in the context of the *Sibron*

presumption. Therefore, we proceed cautiously, examining the nature of the

offense of which Nowakowski was convicted and drawing on principles in other

areas of law where the Supreme Court has addressed similar considerations.

---

[8] *But see infra* note 15 (discussing a situation in which the Supreme Court arguably applied the presumption outside of the context of a formal conviction).

Before commencing our analysis, we think it necessary to explain briefly the New York scheme of penal offenses. The New York Penal Law defines an "offense" as "conduct for which a sentence to a term of imprisonment or to a fine is provided" by a state or local law, ordinance, or regulation. N.Y. PENAL LAW § 10.00[1]. The Penal Law categorizes each offense as one of four types, listed here in descending order of seriousness: a felony, a misdemeanor, a violation, and a traffic infraction. *Id.* § 10.00[2]–[5]. Of these four, only a felony and a misdemeanor are labeled "[c]rime[s]." *Id.* § 10.00[6]. Violations are offenses, other than traffic infractions, "for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed." *Id.* § 10.00[3]. Misdemeanors permit incarceratory sentences of up to one year, while felonies permit incarceratory sentences over one year. *Id.* § 10.00[4]–[5]. Traffic infractions are violations of the Vehicle and Traffic Law, "which [are] not declared by this chapter or other law of this state to be a misdemeanor or a felony." N.Y. VEH. & TRAF. LAW § 155.

In the case before us, Nowakowski was convicted of harassment in the second degree, which New York classifies as a violation. *See* N.Y. PENAL LAW § 240.26. Thus, the critical question is whether, taking into account New York's

16

decision not to label violations as crimes, Nowakowski's conviction is nonetheless "criminal" for purposes of the *Sibron* presumption.

We start from first principles. The *Sibron* presumption is a judicial doctrine concerning mootness under Article III. *See Liner v. Jafco, Inc.*, 375 U.S. 301, 304 (1964). Whether a case is moot is a question of federal, not state, law. *See id.* As a result, we must determine whether Nowakowski's conviction is civil or criminal in nature by reference to federal principles—state law provides the necessary facts underlying the question, but federal law provides the rule of decision. *See, e.g.*, *United States v. Juvenile Male*, 131 S. Ct. 2860, 2864 (2011) (per curiam) (analyzing a certified question of Montana law to determine whether the doctrine of continuing collateral consequences was satisfied). For several reasons, we think the Supreme Court's cases determining the applicability of federal constitutional protections are the most relevant precedents upon which to draw. *See, e.g.*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165–68 (1963) (concluding constitutional criminal protections apply where Congress applies a punitive sanction); *see also, e.g.*, *Allen v. Illinois*, 478 U.S. 364, 368 (1986) (conducting same analysis with respect to sanctions imposed by state law).

17

First, the inquiries are identical in the question presented: whether a

particular proceeding is civil or criminal in nature under federal law. *See Hicks ex*

*rel. Feiock v. Feiock*, 485 U.S. 624, 630 (1988) (endorsing "the characterization of

this proceeding and the relief given as civil or criminal in nature, for purposes of

determining the proper applicability of federal constitutional protections" as

raising "a question of federal law rather than state law"). And second, both the

civil-criminal analysis and the *Sibron* presumption are judicially created

doctrines that give effect to constitutional requirements. *See Kennedy*, 372 U.S. at

167–68; *Sibron*, 392 U.S. at 50. Consequently, we see no reason why, if

Nowakowski's conviction is "criminal" for purposes of federal constitutional

protections, it should not be criminal for purposes of the *Sibron* presumption,[9]

and so we apply the former analysis here.

The Supreme Court has observed that "[t]he categorization of a particular

proceeding as civil or criminal is first of all a question of statutory construction."

*Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) (internal quotation marks omitted).

In construing statutes, we endeavor to "determine the legislative objective"—*i.e.*,

to establish either a civil regulatory penalty or a criminal punishment. *Smith v.*

---

[9] In fact, application of a different test would create serious potential for absurd results, such that a federal court applying federal doctrine could conclude that the same conviction is simultaneously criminal and not.

*Doe*, 538 U.S. 84, 92 (2003).  We start with the fact that New York does not formally classify violations as  "crimes."  *See* N.Y. PENAL LAW § 10.00[6].  Where a legislature has expressly designated a sanction as "civil," that may in some cases suffice to demonstrate evidence of intent.  *See Allen*, 478 U.S. at 368 (describing an express label of a proceeding as "civil" as indicating the state's intent "to proceed in a nonpunitive, noncriminal manner"); *United States v. Ward*, 448 U.S. 242, 249 (1980) (observing Congress labeled a particular sanction as a "civil penalty").  Here, rather than identifying violations or their attendant sanctions as civil in nature, New York has merely excluded them from the classification of "crime."[10]  In a case concerning the *Ex Post Facto* Clause, where Alaska's sex offender registration statute was neither explicitly denoted as civil nor criminal, the Supreme Court looked to the purposes of the law as articulated in its text, as well as "[o]ther formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes."  *Smith*, 538 U.S. at 93–94.

The reasons for applying a functional approach are clear.  States have widely varying designations of offenses under their penal codes, and these

---

[10] Although New York expressly states that punishment for a traffic infraction "shall not be deemed for any purpose a penal or criminal punishment," N.Y. VEH. & TRAF. § 155, it makes no such declaration with respect to violations.

designations subject defendants to different ranges of punishment. For example, elsewhere in our Circuit, Connecticut declines to designate "violations" as crimes,[11] while Vermont has no violations and instead labels all offenses in its penal code as felonies or misdemeanors. *Compare* CONN. GEN. STAT. § 53a-24(a), *with* VT. STAT. ANN. tit. 13, § 1. While New York violations can result in fifteen-day imprisonment, Connecticut violations result only in fines. *Compare* N.Y. PENAL LAW § 10.00[3], *with* CONN. GEN. STAT. § 53a-27(a). The maximum incarceratory sentence for misdemeanors is one year in New York and Connecticut but two years in Vermont. *Compare* N.Y. PENAL LAW § 10.00[4], *and* CONN. GEN. STAT. § 53a-26(a), *with* VT. STAT. ANN. tit. 13, § 1. Such variances counsel against adopting a purely labels-dependent approach to our analysis. If we were to do otherwise, federal jurisdiction over habeas petitions arising from similar or identical conduct and punishment would be controlled by vagaries of nomenclature, not substance.

Adopting the approach of the *Smith* Court, we examine New York's penal code and laws regarding Nowakowski's conviction as a whole, giving due weight to the State's legislative judgments. We conclude that New York

---

[11] However, Connecticut excludes traffic infractions from its definition of "offense." *See* CONN. GEN. STAT. § 53a-24(a).

punishes violations such as Nowakowski's under its criminal, not civil, authority. An action to prosecute a violation is designated a "criminal action" under New York law and may be commenced by filing an information or prosecutor's information, *see* N.Y. CRIM. PROC. LAW § 1.20[4], [6], [16], which are instruments that "constitute[] an accusation on behalf of the state as plaintiff,"*id.* § 1.20[1]. Such actions are governed by the New York Criminal Procedure Law, *see id.* § 1.10[1](a), which requires the State to prove guilt beyond a reasonable doubt, *see id.* § 70.20. These are all customary indicia of the State's exercise of criminal jurisdiction.

Our understanding that Nowakowski's conviction was secured pursuant to New York's criminal authority accords with traditional conceptions of the distinction between criminal and civil jurisdiction:

> The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals; public wrongs, or crimes and misdemeanors, are a breach and violation of the public rights and duties, due to the whole community, considered as community, in its social aggregate capacity.

2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, bk. 4, ch. 1, at 5 (1st ed. 1769).  Harassment in the second degree is conduct that New York seems to view as a public wrong and wishes to punish in its social aggregate capacity.  *See* N.Y PENAL LAW, art. 240 (designated "Offenses Against Public Order" and including harassment in the second degree); *cf. Smith*, 538 U.S. at 94 (observing that codification in the criminal code may constitute some evidence of punitive intent).  Thus, the New York statutory scheme evinces an intent to treat a violation as criminally sanctionable conduct, notwithstanding the formal designation of only misdemeanors and felonies as "crimes."

In the context of federal constitutional protections, a conclusion that the state legislature intended a criminal punishment ordinarily "ends the inquiry." *Smith*, 538 U.S. at 92.  However, the Supreme Court has also developed a set of factors that are "neither exhaustive nor dispositive, but are useful guideposts" for determining whether a statutory penalty is criminal or civil in nature, even where a legislature's intent is to impose civil penalties.  *Id.* at 97 (citations and internal quotation marks omitted).[12]  These factors, first announced in *Kennedy v. Mendoza-Martinez*, *supra*, are as follows:

---

[12] Where statutory intent to designate a sanction as civil is clear, "'only the clearest proof' will suffice to override legislative intent and transform what has been

[1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

372 U.S. at 168–69 (footnotes omitted). The Supreme Court has instructed that "[a]bsent conclusive evidence of [legislative] intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." *Id.* at 169.

However, here, as in *Kennedy*, "the objective manifestations of [legislative] purpose indicate conclusively that the provisions in question can only be interpreted as punitive," and therefore, "a detailed examination along such lines is unnecessary." *Id.*; *see also Smith*, 538 U.S. at 92–93. Nonetheless, for the sake of

---

denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100 (1997) (quoting *Ward*, 448 U.S. at 249).

thoroughness and to assure ourselves of the soundness of our ultimate

conclusion, we briefly address these factors in the context before us.[13]

The first three factors easily weigh in favor of finding this violation

criminal in nature. As discussed above, a conviction exposes a defendant to an

incarceratory sentence of up to fifteen days. Of course, imprisonment is "the

paradigmatic affirmative disability or restraint," *Smith*, 538 U.S. at 100, and thus

incontrovertibly considered punishment. In addition, conviction requires proof

of scienter beyond a reasonable doubt—namely, "intent to harass, annoy or

alarm another person." N.Y. PENAL LAW § 240.26; *see also* N.Y. CRIM. PROC. LAW

§ 70.20. The fourth factor similarly weighs in favor of considering the conviction

criminal: the statute clearly operates to deter bad conduct, and the possible

punishments serve retribution on offenders. The fifth factor is not particularly

appropriate to this context—the criminality, or not, of Nowakowski's conduct is

established by this statute in its own right.

The final two factors—the existence of a rational alternative purpose and

whether the sanction is excessive in relation to it—do not appear to weigh in

favor of finding the sanction civil. As the analysis of factors one, three, and four

_____

[13] In so doing, we are mindful of the *Hudson* Court's admonition that consideration of these factors should evaluate "the statute on its face" rather than "assess the character of the actual sanctions imposed." 522 U.S. at 101 (internal quotation marks omitted).

24

show, the principal effect of the sanctions here is punitive—imprisonment, monetary fines, or both—and do not appear to have an alternate purpose that contributes to a regulatory or civil interest of the state. For example, the Supreme Court concluded in *Smith* that sex offender registration served a nonpunitive civil purpose: "public safety, which is advanced by alerting the public to the risk of sex offenders in their community." 538 U.S. at 103 (alteration and internal quotation marks omitted). No analogous civil interest immediately rises to mind on the law before us, but we need not conclusively decide the question in light of the weight of the other factors.

In summary, we conclude that Nowakowski's conviction is criminal in nature for the purposes of invoking the *Sibron* presumption.[14] We do so primarily because New York has evinced a legislative intent to treat such convictions as criminal, and such intent is supported by our consideration of the *Kennedy* factors.

---

[14] As our analysis here relies upon cases involving federal constitutional criminal protections, such as the Double Jeopardy Clause or the *Ex Post Facto* Clause, a contrary conclusion as to the criminal nature of violations in this case would call into question the availability of those protections for such offenses. Our conclusion avoids that result, but we raise the issue to illustrate that Nowakowski's conviction is best understood as a criminal sanction as a matter of federal law.

**B.**

Having concluded the presumption of continuing collateral consequences should apply, we now turn to whether sufficient collateral consequences to Nowakowski's conviction have been demonstrated. Because Nowakowski's conviction was based on one of the lowest level offenses under state law, we think it is likely that he will suffer fewer collateral consequences than if convicted of a felony or even a misdemeanor. Thus, as his case may end up being on the margins, we think it useful to examine how the presumption will functionally affect our inquiry.

First, *Spencer* defined the Supreme Court's application of the principle as being "willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)." 523 U.S. at 8. This approach has led the Court "to accept the most generalized and hypothetical of consequences as sufficient to avoid mootness in challenges to conviction." *Id.* at 10. *Spencer* used two hypothetical possibilities that a previous decision had deemed sufficient to avoid mootness: "the possibility that the conviction would be used to impeach testimony [a defendant] might give in a future proceeding

and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future." *Id.* (quoting *Evitts v. Lucey*, 469 U.S. 387, 391 n.4 (1985)). These two possibilities span the progression of the *Sibron* presumption. The Court has consistently repeated the idea that a conviction subjects a criminal defendant to the potential for an increased sentence for a subsequent conviction resulting from a not-yet-extant criminal prosecution. *See, e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, 371 n.2 (1993)[15]; *Pennsylvania v. Mimms*, 434 U.S. 106, 108 n.3 (1977); *Benton v. Maryland*, 395 U.S. 784, 790–91 (1969); *Sibron*, 392 U.S. at 55–56. In these cases, the Court has also referred to the potential impeachment to which a defendant may

---

[15] Though lacking express analysis of whether the presumption should apply, *Dickerson* supports our earlier conclusion that the presumption applies to Nowakowski's conviction. There, the Supreme Court dealt with a diversionary sentencing scheme for possession of a controlled substance, pursuant to which "no judgment of conviction" was entered and, following probation, "the original charges were dismissed." *Dickerson*, 508 U.S. at 371 n.2. Minnesota law further specified that the proceeding in which Dickerson was found guilty "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose." *Id.* (quoting MINN. STAT. § 152.18). Nonetheless, the Court held that "a nonpublic record of the charges dismissed," which state law required the state department of public safety to retain, "would carry collateral legal consequences" because of hypothetical future sentencing. *Id*. Since *Spencer* cites *Dickerson* as an example of the presumption, we see no evidence the Supreme Court has walked away from this application. *See Spencer*, 523 U.S. at 10. If Dickerson qualified for the presumption (1) without a judgment of conviction, (2) with eventual dismissal of the original charges, and (3) with an express statement in law prohibiting treating him as a criminal convict, we have difficulty concluding that Nowakowski's formal conviction and sentence falls outside of its scope.

be subject in future proceedings. *See, e.g., Benton*, 395 U.S. at 791; *Sibron*, 392 U.S. at 55–56; *see also Spencer*, 523 U.S. at 10; *Evitts*, 469 U.S. at 391 n.4. Notably, these two consequences both require uncertain future proceedings, the first of which would occur, if at all, by virtue of the defendant's subsequent criminal conduct—*i.e.*, circumstances of his own making.[16] Thus, the first effect of the presumption is to accept a broader category of consequences as sufficient for purposes of avoiding mootness.

Next, we turn to how the presumption affects the parties' obligations to present and prove the existence of collateral consequences. Although *Spencer* marked the Supreme Court's most complete discussion of the presumption, the Court never explicitly identified the nature or operation of the presumption.[17]

---

[16] It goes almost without saying that such speculative, partially self-inflicted results would not satisfy Article III outside of the context of the *Sibron* presumption. *E.g., Lane*, 455 U.S. at 633 n.13 ("The parole violations that remain a part of respondents' records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring."); *accord Probber*, 170 F.3d at 349.

[17] Traditionally, presumptions have been divided into two categories: conclusive presumptions (*presumptio juris et de jure*), which are essentially rules of law and cannot be overcome no matter the strength of the contrary proof, and rebuttable presumptions (*presumptio juris tantum*), which merely act as evidence which can be contradicted by sufficient contrary evidence or determine the case when the evidence is in equipoise. *See* WILLIAM CALLYHAN ROBINSON, ELEMENTS OF AMERICAN JURISPRUDENCE § 375 (1900); BEST ON PRESUMPTIONS § 17 (1845). More recently, however, the Supreme Court has loosely identified four categories of presumptions in the context of the burden of proof:

Lower federal courts have nonetheless overwhelmingly treated the *Sibron* presumption as rebuttable and placed the burden on the state to prove that no collateral consequences will result. *See United States v. Quezada-Enriquez*, 567 F.3d 1228, 1232 n.2 (10th Cir. 2009); *D.S.A. v. Circuit Court Branch 1*, 942 F.2d 1143, 1146 n.3 (7th Cir. 1991); *Malloy v. Purvis*, 681 F.2d 736, 739 (11th Cir. 1982); *Felton v. Mazzuca*, No. 98 Civ. 4567(RJS), 2012 WL 4462009, at *6 n.4 (S.D.N.Y. Sept. 27, 2012); *United States v. Hill*, 171 F. Supp. 2d 1032, 1037–38 (D.S.D. 2001). *But see Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005) (recognizing conclusive presumption).

We think the majority approach is correct. *Sibron* held "that a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." 392 U.S. at 57. This language suggests that the presumption may be rebutted and provides a standard of proof for that rebuttal—"no possibility" of collateral consequences. Further, *Spencer*'s observation that the presumption is an anomaly

---

(1) permissive inferences, which allow but do not require a conclusion, (2) shifting the burden of production, such that a conclusion must be drawn only if no evidence has been produced to the contrary, (3) shifting the burden of persuasion, such that the adversely affected party bears the burden of overcoming the presumption with sufficient evidence, or (4) conclusive presumptions, such that the result is determined regardless of the evidence. *See Sandstrom v. Montana*, 442 U.S. 510, 514–18 (1979).

in Article III standing weighs against making its application conclusive even where the proof shows no collateral consequences.  *See* 523 U.S. at 12.

Where the burden of proof rests is a more difficult question.  The burden of proof is commonly understood to encompass both the obligation to produce some evidence on an issue—*i.e.*, the burden of production—and the obligation to persuade the decision maker that the standard of proof has been met in one's favor—*i.e.*, the burden of persuasion.  *See Burden of Proof*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Were we to conclude that the *Sibron* presumption imposes both obligations on the state, we would be requiring the state both to present potential collateral consequences to the reviewing court and then disprove them.  There are numerous problems with such an approach, not the least of which is the difficulty inherent in proving a universal statement[18]—that no collateral consequences exist.  Further, it creates a situation in which— through human error or otherwise—a state may fail to present an extant collateral consequence to the court, which would have established that the habeas petition was not moot.  Finally, forcing a state to argue against itself would go even further afield from the traditional application of standing, in

---

[18] *See generally* Kevin W. Saunders, *The Mythic Difficulty in Proving a Negative*, 15 SETON HALL L. REV. 276 (1985) (noting that the proverbial difficulty in proving a negative is, in reality, difficulty in proving a universal statement).

which the proponent of jurisdiction bears the burden of "alleg[ing] facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer*, 523 U.S. at 11 (internal quotation marks omitted).

By contrast, requiring habeas petitioners to identify at least some collateral consequence that threatens them balances practical considerations and operation of the presumption. In the ordinary case, petitioners—and the court—may look to the consequences regularly appearing in this context: *e.g.*, future sentence enhancement, impeachment, or civil disabilities. Where those readily identifiable consequences are not present, however, the state should not bear the burden of both identifying and refuting every possible alleged consequence in its laws. Mindful of the Supreme Court's caution in this area, we conclude that a petitioner seeking habeas review must identify some continuing collateral consequences that may flow from his criminal conviction—including those that, as discussed above, are merely hypothetical and speculative.[19] Once a petitioner does so, however, the state bears the burden to prove by sufficient evidence that

---

[19] Additionally, we note that even where a criminal conviction is the subject of the inquiry, if the identified collateral consequences arise from separate and independent grounds from that conviction, the conviction "can have no meaningful effect . . . and hence cannot serve as a possible collateral consequence." *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002). This principle does not mean, however, that all convictions after the first (or most severe) do not have collateral consequences, if each marginally increases some risk or consequence. *See Sibron*, 392 U.S. at 56.

there is "no possibility" such consequences will attach to his conviction. *See*

*Sibron*, 392 U.S. at 57.

With our framework established, we apply the *Sibron* presumption to the

facts of this case. Nowakowski has identified a sufficient collateral consequence

to avoid mootness in this case—namely, the potential for impeachment in a

future proceeding.[20] Under New York law, the trial court in its discretion may

permit cross-examination into a criminal defendant's prior bad acts or crimes

upon balancing the probative value of the evidence with the risk of unfair

prejudice. *See generally People v. Sandoval*, 34 N.Y.2d 371 (1974). In these

instances, the defendant bears the burden "of demonstrating that the prejudicial

effect of the admission of evidence thereof for impeachment purposes would so

far outweigh the probative worth of such evidence on the issue of credibility as

to warrant its exclusion." *Id.* at 378.

Additionally, where a criminal defendant presents evidence of his good

character, the prosecution may prove a conviction tending to negate such trait;

similarly, where conviction of an offense "constitutes an element of the offense

---

[20] Nowakowski's brief focuses on the threat of impeachment in his § 1983 suit.
However, because of the prevalence of impeachment as a collateral consequence and
our obligation to construe *pro se* submissions liberally, we interpret Nowakowski's
briefs and oral arguments to challenge the threat of impeachment through use of his
conviction generally.

charged, or proof thereof is otherwise essential to the establishment of a legally sufficient case," the previous conviction may be proved. N.Y. CRIM. PROC. LAW § 60.40[2]–[3].[21] In least one decision, the Appellate Division has held that a conviction for harassment in the second degree can be the subject of proper cross-examination. *See People v. Hogencamp*, 295 A.D.2d 643, 643–44 (N.Y. 3d Dep't 2002); *see also* N.Y. CRIM. PROC. LAW § 60.40[1] (permitting independent proof of conviction where it is a proper subject of cross-examination and the defendant denies or answers equivocally). Consequently, we conclude that Nowakowski's conviction subjects him to the possibility of impeachment in a future criminal proceeding and thus presents a sufficient continuing collateral consequence to satisfy the requirements of a live case or controversy. *See Evitts*, 469 U.S. at 391 n.4; *Sibron*, 392 U.S. at 55–56.[22]

---

[21] In fact, the *Sibron* Court cited the predecessor statute to § 60.40 as the basis for its conclusion that the defendant could be subject to impeachment in a subsequent criminal proceeding. *See* 392 U.S. at 55–56.

[22] Nowakowski has also argued that his conviction bars his § 1983 action under the doctrine of *Heck v. Humphrey*, *supra*, and that bar constitutes an additional collateral consequence. Though the People urge us to hold that *Spencer* squarely forecloses this argument, we decline to do so for two reasons. First, *Spencer* ultimately concluded no presumption should apply to parole revocations and thus held that the *Heck* bar was insufficient under the traditional rules of Article III standing, rather than the relaxed standard applicable to convictions. *See* 523 U.S. at 17. Second, we think the discussion in *Spencer* is less clear-cut than the People maintain. Although seven Justices joined Justice Scalia in concluding that the *Heck* argument was "a great non sequitur," *id.*, half

## III.

We conclude by addressing our colleague's thoughtful dissenting opinion.

As we read it, the dissent's principal thesis is that the *Sibron* presumption was

designed to apply—and therefore only applies—to convictions from which

significant collateral consequences are likely to result.[23]  *See, e.g.*, Dissenting Op.,

*post*, at 2–3, 19.  We think the dissent's approach is incompatible with the

Supreme Court's practice and statements.  As an analytical matter, the dissent

conflates the separate steps undertaken in *Sibron* and *Spencer* into a single inquiry

---

the majority wrote in concurrence that if *Heck* did in fact bar the action, it "would provide a reason, whether or not dispositive, to recognize continuing standing to litigate his habeas claim," *id.* at 19 (Souter, J., joined by O'Connor, Ginsburg, and Breyer, JJ., concurring).  The concurring Justices concluded, however, that "Spencer is free to bring a § 1983 action, and his corresponding argument for continuing habeas standing falls accordingly." *Id.*  We find unclear, therefore, *Spencer*'s discussion of the *Heck* bar as a continuing collateral consequence where (1) a conviction, rather than a parole revocation, is challenged and (2) where *Heck* would in fact bar the claim.  However, because the possibility of impeachment constitutes a sufficient collateral consequence, we need not decide Nowakowski's *Heck* bar argument.

[23] The dissent insists that its approach cabining the *Sibron* presumption to certain "categories" of criminal convictions "is not [its] own."  *Post* at 6–7 n.6.  *Spencer*, the dissent claims, did the same by refusing to apply *Sibron* to a parole revocation.  *Id.* (citing *Spencer*, 523 U.S. at 12).  The dissent misreads *Spencer*'s categorization of types of adjudication as an invitation to subcategorize further.  Rather than debating whether we should apply *Sibron* to a new "category of adjudication"—*e.g.*, a criminal conviction, a parole revocation, or a designation as an enemy combatant—the dissent proposes that we split the category of criminal convictions into subcategories: criminal convictions significant enough to warrant *Sibron* and those too insignificant to warrant *Sibron*.  That new process of subcategorizing is novel and may someday be the law.  But today, it is not.

about whether collateral consequences *do in fact* flow from the defendant's conviction. In other words, the dissent's approach would require a court to find that collateral consequences generally flow from the conviction before it applies a presumption that assumes, as a first step subject to rebuttal, that collateral consequences generally flow from the conviction. Such an approach is, of course, no presumption at all—and if it were the approach the Supreme Court intended, *Spencer* could have been a great deal shorter and far less concerned with the presumption's anomalous place in Article III standing analysis.

The *Spencer* Court described its precedents as being "willing to presume that a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are *remote and unlikely to occur*)." *Spencer*, 523 U.S. at 8 (emphasis added); *see also id*. at 10 ("[After *Sibron*], and in summary fashion, we proceeded to accept *the most generalized and hypothetical of consequences* as sufficient to avoid mootness in challenges to conviction." (emphasis added)). It also characterized its past practice as "presuming collateral consequences (or of accepting the *remote possibility* of collateral consequences as adequate to satisfy Article III)." *Id.* at 10 (emphasis added); *see also id.* at 12 (describing it as "our presumption of collateral

consequences (or our willingness to accept hypothetical consequences)").  The

dissent appeals to the single instance in *Spencer* that uses the terms "significant"

and "likely":  "In the context of criminal conviction, the presumption of

significant collateral consequences is likely to comport with reality.  As we said

in *Sibron*, it is 'an obvious fact of life that most criminal convictions do in fact

entail adverse collateral legal consequences.'"  *Id.* at 12 (quoting *Sibron*, 382 U.S.

at 55).  But here is the language immediately following that line in *Sibron*: "The

mere 'possibility' that this will be the case is enough to preserve a criminal case

from ending 'ignominiously in the limbo of mootness.'" 392 U.S. at 55 (quoting

*Pollard v. United States*, 352 U.S. 354, 358 (1957), and *Parker v. Ellis*, 362 U.S. 574,

577 (1960) (Warren, C.J., dissenting)).  The dissent's attempt to convert the

presumption's operation into an examination of the likelihood of collateral

consequences for the conviction at issue, *see post*, at 25, is inconsistent with the

Court's actual practice, as well as *Spencer*'s description of that practice.[24]

---

[24] We also note that the dissent's reliance on a degree of "likelihood" will result in
practical chaos.  Automatic statutory disabilities—like disenfranchisement or
employment disqualification, *see* Dissenting Op., *post*, at 6–7, 7 n.7—do not require
operation of a presumption; they are actual, extant consequences from which the
defendant currently suffers.  Thus, the only function of the presumption is with respect
to hypothetical, future consequences.  But a court applying a "likelihood" approach
would have to determine whether hypothetical collateral consequences, *e.g.*, denials of
handgun permits in New York City—authorized when an individual has been

The dissent's approach is also in significant tension with *Minnesota v. Dickerson*, 508 U.S. 366 (1993).  As we note above, *see supra* note 15, *Dickerson* involved a case in which "no judgment of conviction was entered and, upon respondent's successful completion of probation, the original charges were dismissed," and in which a Minnesota law specifically prohibited the proceeding from being "deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose."  508 U.S. at 371 n.2 (quoting MINN. STAT. § 152.18).  It is hard to imagine a case—including this one—that would meet the dissent's proposed standard less than *Dickerson*— and yet the *Spencer* Court cited it as an example of the presumption without a hint of disavowal, *see* 523 U.S. at 10.

In short, we think the dissent's approach begs the question by demanding evidence of collateral consequences to invoke a rebuttable presumption that assumes those consequences exist.  Accepting the dissent's propositions would also require us to conclude that what the Supreme Court has called a "presumption," *Spencer*, 523 U.S. at 8, is not really a presumption at all; that

convicted of a violation, *see* Rules of the City of New York, tit. 38, § 5-10(a), are more or less likely than those the Supreme Court has identified, *e.g.*, the potential for future criminal prosecution.  Asking a court to make that determination seems to invite judicial speculation or, worse, attempts at a *Minority Report*-like predictive criminology.

when the Court said the presumption "is applied to criminal convictions," *id.*, it meant to say, but did not, that it is applied only to *serious* criminal convictions; and that when the Court said "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction," *Sibron*, 392 U.S. at 57, it did not really mean the words *only*, *no*, or *any*. While the Supreme Court may choose to cabin the presumption to specific offenses of a certain order of magnitude in the future, the Court has not done so yet. We therefore "leav[e] to [the Supreme Court] the prerogative of overruling its own decisions," *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989), and take the Court at its word.[25] Because Nowakowski has identified the possibility of a collateral consequence stemming from a criminal conviction—a consequence significant enough to have been accepted by the Supreme Court in the past—his case is not moot.

---

[25] We express no opinion about how we would approach this question from a "blank slate." Dissenting Op., *post*, at 28. When confronted with Supreme Court precedent, it is not the job of this Court to ruminate on what it might do without that guidance. Our refusal to engage the dissent's "blank slate" should not be confused for implicit approval of the dissent's novel approach.

## CONCLUSION

In sum, Nowakowski was in custody for the purposes of habeas review while under a sentence of conditional discharge that obligated him to appear in specific places at specific times and subjected him to the discretion of the court to modify or revoke his discharge. In addition, Nowakowski's conviction is criminal for the purposes of the *Sibron* presumption, and he has identified a continuing collateral consequence under its application. His petition thus presents a live case or controversy sufficient to sustain federal jurisdiction. Accordingly, the District Court's order of May 30, 2014, is hereby VACATED, and the case is REMANDED to the District Court for further proceedings consistent with this opinion.

LIVINGSTON, *Circuit Judge*, dissenting:

A petitioner must, at "all stages of federal judicial proceedings," be able to demonstrate that he has "suffered[] or [is] threatened with[] an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990)). Absent a concrete, non-speculative, and redressable injury, a case ceases to present "a case or controversy under Article III . . . of the Constitution." *Id.* As we have long observed, "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).

Robert Nowakowski cited a single collateral consequence in his initial habeas petition — the potential that a subsequent suit for damages under 42 U.S.C. § 1983 might not be successful absent habeas relief — a consequence that the Supreme Court has previously determined to be insufficient to confer jurisdiction over a petition for habeas corpus on a federal court.[1] *See Spencer*, 523

---

[1] Before the district court, Nowakowski did not raise the possibility that his conviction might be used to impeach him in a future court proceeding until his second

U.S. at 17 (discussing *Heck v. Humphrey*, 512 U.S. 477 (1994)). The majority does not suggest that, under traditional Article III principles, Robert Nowakowski's petition for habeas corpus would be justiciable. *See* Maj. Op. at 28 n.16. Instead, the majority concludes that this case is not moot for two interlocking reasons. First, in the majority's view, *Sibron v. New York*, 392 U.S. 40 (1968), requires that we apply a presumption of collateral consequences to Nowakowski's conviction for committing a violation-level offense, notwithstanding the Supreme Court's suggestion in *Spencer* that such a presumption accords with Article III principles only when it is a "presumption of *significant* collateral consequences" that "comport[s] with reality." 523 U.S. at 12 (emphasis added). Next, having extended this presumption further than the Supreme Court has ever extended it, the majority applies the presumption in a way that makes it all but irrebuttable, concluding that a single unlikely consequence — the remotest risk of impeachment (more remote than the risks rejected as insufficient to create jurisdiction in *Spencer*, 523 U.S. at 14-17*)* — suffices to defeat mootness here.

---

reply letter to the Government's motion to dismiss his petition as moot. *See* Second Letter from Robert Nowakowski in Opp. to Gov't's Mot. to Dism. on Mootness Grounds at 1, *Nowakowski v. New York*, No. 13-cv-3709(ENV)(LB) (E.D.N.Y. May 30, 2014), ECF No. 22 ("Second Nowakowski Letter").

I would hold that, because application of a "presumption of significant collateral consequences" to a conviction for a violation-level offense in New York "is [not] likely to comport with reality," Supreme Court precedent neither requires nor permits us to extend that presumption to the category of judgment at issue here. *Id.* at 12. Assuming, *arguendo*, that such a presumption does apply, I would further find that the Government has clearly rebutted it. Accordingly, I would dismiss Nowakowski's petition as moot.

## I.

Robert Nowakowski was convicted of harassment in the second degree, a violation-level offense in New York (specifically denominated a "petty offense," rather than a "crime") for which the maximum punishment is fifteen days' incarceration and/or a $250 fine. *See* N.Y. Penal Law § 10.00 (defining four categories of "offenses," including "[t]raffic infraction[s]," "[v]iolation[s]," "[m]isdemeanor[s]," and "[f]elon[ies]," the latter two of which are formally labeled "[c]rime[s]"); *id.* § 240.26 (defining harassment in the second degree as a "violation"); N.Y. Crim Proc. L. § 1.20(39) (defining "[p]etty offense" to mean "a violation or traffic infraction"); N.Y. Penal Law § 80.05(4) (articulating the

3

maximum fine).[2]  Nowakowski was originally sentenced to pay a $100 fine. Several years after his initial sentencing, however, and just prior to his filing suit pursuant to 42 U.S.C § 1983 seeking money damages for alleged violations of his constitutional rights in connection with his conviction, he successfully moved the New York court to resentence him to a year of conditional discharge with the sole condition of mandatory attendance at a day of community service.[3]

---

[2] A defendant may be convicted of harassment in the second degree for, *inter alia*, "follow[ing] a person in or about a public place" and "engag[ing] in a course of conduct . . . which . . . seriously annoy[s] [an]other person."  N.Y. Penal Law § 240.26. Other violation-level offenses in New York include disorderly conduct, *see id.* § 240.20 (defining the offense to include, *inter alia*, "obstruct[ing] vehicular or pedestrian traffic"); loitering, *see id.* § 240.35 (including when a person "remains in any transportation facility [without authorization] . . . for the purpose of entertaining persons by singing, dancing or playing any musical instrument"); and "[u]nlawfully posting advertisements," *see id.* § 145.30 (including when a person, "having no right to do so nor any reasonable ground to believe that he has such right, . . . posts, paints or otherwise affixes to the property of another person any advertisement, poster, notice or other matter designed to benefit a person other than the owner of the property").  New York is not alone in distinguishing "crimes" from more petty violations. *See, e.g.*, 18 Pa. C.S.A. § 106 (listing felony, misdemeanor, and "summary offenses," the latter including offenses expressly designated as such as well as offenses for which "the maximum [term of incarceration that may be imposed] is not more than 90 days"); *see also  id.* § 6708 (designating "[r]et[aining] library property after notice to return" a summary offense).

[3] The majority observes that the "Notice of C.S. Obligation" Nowakowski received indicated that the date for performance could not be rescheduled.  Maj. Op. at 12.  This is so, but it is also the case that the sentencing court explicitly solicited Nowakowski's input in selecting the day, asking whether "[a]ny particular day work[ed] for [him]" and indicating that the individuals who would schedule the day would "ask [Nowakowski]" what he would prefer.  Gov't App'x at 6.

4

Days before he was to perform his community service, Nowakowski filed a petition for habeas relief. Likely aware that he would complete his sentence prior to adjudication of his habeas motion, *cf. Spencer*, 523 U.S. at 7 (noting that, once a sentence expires, a petitioner must point to "some concrete and continuing injury . . . if the suit is to be maintained" (citing *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968)), Nowakowski asserted a single collateral consequence to defeat mootness: that, absent favorable termination in his habeas proceeding, he might be unable successfully to pursue his damages suit, *cf. id.* at 17 (dismissing this argument as "a great non sequitur").[4] At no point — either before the district court or before this Court on appeal — did Nowakowski argue that a presumption of collateral consequences did or should apply to his violation-level conviction, an offense sufficiently low-level as not to be labeled criminal by New York State.[5]

---

[4] In his second reply letter to the Government's motion to dismiss on mootness grounds, Nowakowski briefly noted that the conviction might be used to impeach him in a future court proceeding. *See* Second Nowakowski Letter, *supra*, at 1.

[5] Where a petitioner — even a pro se petitioner — fails to make a particular argument before our Court — let alone fails to make the argument before our Court and the district court — we generally deem the argument waived. *Cf. Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998) (noting, in a case where the petitioner failed to allege in the district court any continuing legal consequences sufficient to permit his petition for coram nobis relief to survive, but *did* cite such consequences on appeal, that, though "a district court must review a *pro se* petition for collateral relief 'with a lenient

The Government, in addition to arguing that a *Heck* bar (whether or not it would exist here) is not a sufficient collateral consequence to keep Nowakowski's petition alive, argued that a violation-level conviction, which is not denominated a crime, does not, as a categorical matter, entail sufficient collateral consequences to support federal jurisdiction.[6]   A conviction for a

---

eye, allowing borderline cases to proceed,' [w]here . . . a petition fails even vaguely to suggest an essential element of a claim for relief, the district court is not required to overlook the deficiency" (quoting *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d Cir. 1983)); *LoSacco v. City of Middletown,* 71 F.3d 88, 93 (2d Cir. 1995) ("[W]e need not manufacture claims of error for an appellant proceeding *pro se,* especially when he has raised an issue below and elected not to pursue it on appeal.").  Though a party cannot waive a *challenge* to the court's jurisdiction, that does not mean that a party cannot waive a particular argument as to *why* the court would *have* jurisdiction.  *See, e.g., Diaz v. State of Florida Fourth Jud. Circ. ex rel. Duval Cty.,* 683 F.3d 1261, 1264 n.5 (11th Cir. 2012); *see also Wenegieme v. Wells Fargo Home Mortg.,* __ F. App'x __ 2016 WL 1039578, at *1 (2d Cir. Mar. 16, 2016) (summary order) (finding that a pro se litigant's failure to challenge on appeal a district court's findings in regard to its jurisdiction waived that challenge). The majority nevertheless decides the case on a ground not suggested by Nowakowski, either before the district court, or on appeal.  As the majority addresses the argument, so do I.

[6] In suggesting that certain consequences are likely or unlikely to exist as a "categorical matter," I mean to distinguish the general likelihood that collateral consequences will flow from a particular category of adjudication from the specific likelihood that a given petitioner may be facing a concrete harm.  Though the latter question is always relevant to whether a petition is moot (whether or not one applies a presumption), the former is germane to whether application of a *presumption* of significant collateral consequences serves the purposes of Article III, or amounts to mere expansion of jurisdiction by "judicial decree."  *Kokkonen,* 511 U.S. at 377.  This distinction between asking whether a *category* of adjudication is likely, in the ordinary case, to entail significant collateral consequences, and whether a specific petitioner has sufficiently alleged harm is not my own.  In *Spencer,* the Court held that parole revocations, as a category of adjudication, were insufficiently likely to entail significant

violation-level offense in New York does not disqualify a defendant from voting, *see* N.Y. Elec. Law § 5-106, or from serving on a jury, *see* N.Y. Jud. Law § 510. Nor does it appear generally to disqualify a person from engaging in any type of employment.[7] In general, the records of any arrest and prosecution that ends in conviction of a violation are sealed upon termination of the action, or destroyed or returned to the defendant. *See* N.Y. Crim. Proc. Law § 160.55. Such a conviction does not automatically enhance a future sentence under New York law, *see* N.Y. Penal Law § 70.06 (enhancing a sentence on the basis of a prior

---

collateral consequences in the ordinary case to merit a presumption of such consequences, *see Spencer*, 523 U.S. at 12, before asking whether the *specific* petitioner had presented sufficient consequences to defeat mootness, *see id.* at 14. Post-*Spencer*, we have consistently approached the question whether to apply a presumption to a new category of adjudication by asking whether, as a categorical matter, such a presumption would be warranted. *See, e.g.*, *United States v. Mercurris*, 192 F.3d 290, 293-94 (2d Cir. 1999).

[7] *See, e.g.*, N.Y. Jud. Law § 90 (observing that conviction of a felony results in immediate disbarment of an attorney and that conviction of a "serious crime" results in suspension — with the latter defined either as a crime that is a felony "under the laws of any state, district or territory or of the United States" though not in New York, or which has, as "a necessary element . . . interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or conspiracy or solicitation of another to commit a serious crime"); N.Y. Gen. Bus. Law § 89-ggg (empowering the state to take adverse action against an individual licensed to provide armored car services if that individual has, *inter alia*, been "convicted of a serious offense or misdemeanor which, in the discretion of the secretary, bears such a relationship to the provision of armored car services . . . as to constitute a bar to licensure or renewal").

felony conviction), or under federal law, *see* U.S.S.G. § 4A1.2(c) (excluding prior non-felony offenses for purposes of calculating a Guidelines level if they appear on a list of petty offenses or are "similar to [those offenses appearing on the list]" unless "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense").

The district court, having no argument before it that a presumption of collateral consequences should apply, and having been presented with no reference to impeachment in any of Nowakowski's initial briefs, dismissed his petition as moot on the simple basis that Nowakowski's single alleged consequence — a potential *Heck* bar — had "no effect on" the mootness analysis. App'x at 3. The majority revives Nowakowski's petition, concluding that a presumption of collateral consequences (which Nowakowski himself did not argue should apply) applies, and that Nowakowski's petition is thus not moot. The majority holds that Supreme Court precedent mandates such a result. Analysis of this precedent suggests, instead, that the majority, far from applying the presumption as the Court has previously applied it, has *extended it* — and

that this extension is unwarranted on the basis of the holdings and reasoning of

*Sibron* and *Spencer*.

## II.

## A.

The genesis of this case can be tied to two Supreme Court cases, both decided in 1968. In *Carafas v. LaVallee,* the Supreme Court held that the fact that a habeas petitioner's sentence had expired would not render his petition for habeas relief moot as, though his incarceration itself could no longer be remedied, he nevertheless faced collateral consequences as a result of his convictions for two felonies — burglary and grand larceny. 391 U.S. at 236-37. As support for its conclusion, the Court cited numerous consequences that flowed from these convictions, observing that "[the petitioner could not] engage in certain businesses[,] . . . serve as an official of a labor union for a specified period of time[,] . . . vote in any election held in New York State[,] . . . [or] serve as a juror." *Id.* at 237. "Because of these [consequences, the petitioner had] 'a substantial stake in the judgment of conviction which survive[d] the satisfaction of the sentence imposed on him.'" *Id.* (quoting *Fiswick v. United States*, 329 U.S. 211 (1946) (in which a conviction rendered a petitioner "liable to deportation and

9

denial of naturalization, and ineligible to serve on a jury, vote, or hold office,"

*Spencer*, 523 U.S. at 9)).

One month later, the Court decided *Sibron*, which, though in the context of a direct appeal, extended the reasoning in *Carafas* and *Fiswick* and articulated the presumption that the majority applies here. In *Sibron*, the Court faced the question whether an appellant's completion of his sentence — six months in jail for conviction of unlawful possession of heroin — rendered his appeal moot.[8] *See* 392 U.S. at 40. Relying primarily on three cases, *Fiswick*, *United States v. Morgan*, 346 U.S. 502 (1954), and *Pollard v. United States*, 352 U.S. 354 (1957), each of which specifically addressed the collateral consequences of felony convictions, *see, e.g.*, *Fiswick*, 329 U.S. at 222 ("[U]nless pardoned, [the defendant will] carry through life the disability of a felon[,] and by reason of that fact he might lose certain civil rights."); *Pollard*, 352 U.S. at 358 (relying on *Morgan* and *Fiswick*'s discussion of the civil disabilities associated with felony convictions to observe that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits"), *Sibron* determined that it did not.

---

[8] Sibron was initially charged with a felony but ultimately convicted of a misdemeanor. *See Sibron*, 392 U.S. at 45 n.1.

The *Sibron* Court began by suggesting that *Pollard* "acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." *Sibron*, 392 U.S. at 55. It then, "without pausing to canvass the possibilities in detail," proceeded to describe specific potential consequences that could flow from the conviction at issue in *Sibron* itself. *Id.* These included the two consequences that the majority highlights — that the conviction could "be used to impeach [Sibron's] character should he choose to put it in issue at any future criminal trial [and] . . . that [the conviction] must be submitted to a trial judge for his consideration in sentencing should Sibron again be convicted of a crime." *Id.* at 55-56. The Court noted, however, that "[t]here are doubtless other collateral consequences" — a proposition likely true in the context of a serious misdemeanor conviction and certainly true in the context of the felonies at issue in the precedent on which *Sibron* built its holding. *Id.*; *see also Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir. 2002) (observing that, "in *Sibron*[], the Court, citing various collateral consequences such as deportation, inability to become a citizen, impeachment evidence in future criminal trials, and increased future sentences, asserted a *presumption* that collateral consequences attach to criminal convictions post-release").

11

In the decades that followed, the Court applied the presumption articulated in *Sibron* in the context of felony convictions, at no point applying it to an offense as categorically low-level as Nowakowski's, nor to any offense even arguably not designated a "crime."[9]  Even as the Court continued to apply the presumption to felony convictions, moreover, it issued two decisions limiting the presumption's scope and even questioning its application in *any* circumstances.

First, in *Lane v. Williams*, 455 U.S. 624 (1982), the Court assessed whether respondents' attack on their sentences to parole terms was rendered moot when these terms expired.[10]  The *Lane* Court did not explicitly discuss the applicability or non-applicability of a "presumption of collateral consequences."  It did, however, find the case moot.  The Court began by observing that, in *Carafas*, numerous collateral consequences associated with the felony conviction there (including, in that case, disenfranchisement) "were sufficient to ensure that the litigant had" a constitutionally sufficient personalized stake.  *Id.* at 632 (quoting *Carafas*, 391 U.S. at 237).  The Court then concluded that the "doctrine of *Carafas*

---

[9] *See Minnesota v. Dickerson*, 508 U.S. 366, 371 n.2 (1993); *Ball v. United States*, 470 U.S. 856, 864-65 (1985); *Evitts v. Lucey*, 469 U.S. 387, 391 n.4 (1985); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 n.3 (1977); *Benton v. Maryland*, 395 U.S. 784, 790-91 (1969).

[10] The respondents did not attack the convictions pursuant to which they had been sentenced, though they did seek effectively to expunge findings that they had violated their parole.  *See id.* at 631.

and *Sibron* [was] not applicable in this case" because "[n]o civil disabilities such as those present in *Carafas* result from a finding that an individual has violated parole." *Id.* In contrast to the "statutory consequences" *Carafas* discussed, "a finding that an individual has violated parole," the Court observed, at most leads to "non-statutory consequences" — including adverse employment prospects or the potential that "the sentence imposed in a future criminal proceeding, could be affected." *Id.* Such consequences would depend on "discretionary decisions" of an employer or sentencing judge. *Id.* at 632-33. The Court further noted that the potential that parole violations might be "considered in a subsequent parole determination" was also insufficient to defeat mootness: *Carafas* "concerned *existing* civil disabilities," but the finding that the respondents violated their parole could not "affect a subsequent parole determination unless [they] again violate[d] state law, [were] returned to prison, and bec[a]me eligible for parole," a sequence of events "[r]espondents themselves [would be] able—and indeed required by law—to prevent." *Id.* at 632 n.13 (emphasis added). Further, such a finding did not in and of itself render someone ineligible for future parole, but was "simply one factor, among many" that might be considered. *Id.* Finally, the Court observed: "Collateral review of a final judgment is not an endeavor to be

13

taken lightly. It is not warranted absent a showing that the complainant suffers actual harm from the judgment that he seeks to avoid." *Id.*

In *Spencer*, the Supreme Court addressed whether a petitioner's challenge to an order revoking his parole — an order based, *inter alia*, on a finding that he had committed forcible rape — was rendered moot when the petitioner's sentence expired. Unlike *Lane* (which found the petition moot but did not expressly analyze whether a presumption applied), the Court began by explicitly concluding that a presumption of collateral consequences is not appropriately applied to a parole revocation. *See* 523 U.S. at 8. In so concluding, the Supreme Court criticized the presumption as applied even to criminal convictions, but it did not overturn it. It did, however, explain *why* the *Sibron* Court had applied a presumption in that case. First, *Spencer* noted that the *Sibron* Court's understanding of standing and mootness was based on a then-dominant view of such Article III doctrines as simply ensuring the sharpening of issues, a "parsimonious view" that "ha[d] since yielded to the acknowledgment that" such doctrines constitute a vital "means of defin[ing] the role assigned to the judiciary in a tripartite allocation of power." *Id.* (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982)).

14

Second, the Court explained that "it is an 'obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences,'" *id.* at 12 (quoting *Sibron*, 392 U.S. at 55), a proposition which meant that, in the context of such convictions, "the presumption of significant collateral consequences is likely to comport with reality." *Id.* The Court then explained why such a presumption should *not* apply to Spencer's parole revocation: unlike "most criminal convictions," such adjudications were not categorically likely to entail significant collateral consequences. *Id.*

Having determined that a presumption of collateral consequences would not apply, the Court proceeded to examine, *inter alia*, five alleged consequences claimed by the petitioner, finding each inadequate to create a case or controversy. First, the Court held that the possibility that the revocation could be used to the petitioner's detriment in some future parole proceeding was a mere "possibility rather than a certainty or even a probability." *Id.* at 14. Second, while agreeing that "the Order of Revocation could be used to increase [the petitioner's] sentence in a future sentencing proceeding," the Court observed that such a possibility was too remote as "it was contingent upon respondents' violating the law, getting caught, and being convicted." *Id.* at 15. Third and

15

fourth, though the Court did not disagree that the order might "be used to impeach [the petitioner] should he appear as a witness or litigant in a future criminal *or civil* proceeding," *id.* (emphasis added); or "used against him directly, pursuant to [the federal rules of evidence]," it held that, because such impeachment would turn on various "'discretionary decision[s]'" of the prosecutor or adverse counsel, *id.* at 16 (quoting *Lane*, 455 U.S. at 632); as well as the similarly discretionary decision of the "presiding judge" to admit such evidence, the possibility was overly remote, *id*. Finally, the Court addressed the petitioner's argument that, absent habeas relief, he would be unable to pursue a claim for damages under 42 U.S.C. § 1983. The Court concluded that such an argument was "a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available." *Id.* at 17. Having determined that the consequences on which Spencer relied (consequences of substantially greater severity than the consequences at issue here) were insufficient to create a case or controversy, the Court dismissed the petition as moot.

16

**B.**

As framed by the majority, this case requires us to determine whether the presumption of collateral consequences applied in cases like *Sibron* should be extended as well to a conviction for a violation-level offense in New York. I would hold that because such an offense, unlike the judgments to which the Court has previously applied such a presumption, is not likely to entail significant collateral consequences, such extension is not warranted. I reach this conclusion for two interrelated reasons.

First, as is evident from the above description of the *Sibron* line, the Supreme Court has never before applied a presumption of collateral consequences to a judgment as low-level as Nowakowski's (whether or not denominated "criminal") — nor, for that matter, to a conviction properly labeled a "petty offense" as that term is understood in constitutional parlance.[11] The

---

[11] Our constitutional jurisprudence has long distinguished "petty offenses" from "crimes" within the meaning of the Sixth Amendment, and on the basis that the former are less likely to entail sufficiently serious consequences to justify application of certain constitutional protections. *See infra* pp. 31-32. The distinction arises in numerous contexts material to whether a judgment will entail collateral consequences. *See, e.g.*, U.S.S.G. § 4A1.2(c) (generally excluding such offenses from criminal history calculations for Guidelines purposes). The Court, moreover, has expressly acknowledged the necessity of determining whether rules announced broadly as applicable to criminal cases necessarily apply as well to petty offenses. *See Scott v. Illinois*, 440 U.S. 367, 372 (1979).

lowest-level offense to which the Court has previously applied the presumption was the offense in *Sibron* itself — unlawful possession of heroin, a misdemeanor for which Sibron received a six months' sentence.[12]   392 U.S. at 45 n.1.  In the years since, the Court has consistently applied the presumption only to felony convictions — a consistency that made it possible for *Spencer* convincingly to

---

[12] Several lower courts have held that various lower-level misdemeanor convictions carried insufficient collateral consequences to support jurisdiction, though they have not always clarified whether they have applied a presumption of collateral consequences to such convictions.  *See e.g.*, *Wickstron v. Schardt*, 798 F.2d 268, 270 (7th Cir. 1986) (per curiam) (though resolving the case on other grounds, expressing doubt that the petition was not moot, and observing that "[i]n *Carafas*, the felony conviction at issue resulted in disenfranchisement, disqualification for certain jobs and businesses, and many other serious legal consequences . . . .  [, but the petitioner] does not allege that his misdemeanor convictions produce similar effects"); *Broughton v. North Carolina*, 717 F.2d 147, 148-49 (4th Cir. 1983) (per curiam) (concluding that the habeas petition was moot because petitioner's conviction for criminal contempt, a misdemeanor pursuant to which petitioner had served a 30-day sentence, did not carry sufficient cognizable collateral consequences); *cf, Mongeluzzo v. Henicks*, 2014 WL 5685551, at *4 (W.D. Pa. Nov. 4, 2014) (collecting cases for the proposition that "[c]ourts have reached different conclusions regarding whether collateral consequences are presumed with respect to misdemeanor convictions").  The Ninth Circuit, in contrast, has explicitly held that a "presumption that collateral consequences flow [is applicable to] *any* criminal conviction," *Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994) (quoting *Hirabayashi v. United States*, 828 F.2d 591, 605-06 (9th Cir. 1987)), though this holding has been criticized within the circuit, *see Larche v. Simons*, 53 F.3d 1068, 1070 (9th Cir. 1995), and at least one subsequent panel has assessed the mootness of a "petty misdemeanor" without, seemingly, applying a presumption, *see United States v. Roblero-Solis*, 588 F.3d 692, 698 (9th Cir. 2009) (though finding an appeal from a "petty misdemeanor[]" not moot, citing to *Spencer* for the proposition that "the prospect of a higher sentence" was insufficient, by itself, to render the case justiciable, and engaging in a discussion that would seem unnecessary were the panel to have applied *Chacon*'s irrebuttable presumption).

observe that the "presumption of significant collateral consequences [was] likely to comport with reality."  *Spencer*, 523 U.S. at 12.  This factual consistency is relevant to whether such a presumption should — and certainly need — apply here.  *Cf. Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 602 (6th Cir. 2007) (distinguishing "the ordinary rule refinement that appellate courts necessarily engage in [from] an improper departure from binding Supreme Court precedent," in the context of distinguishing a prior Supreme Court case that did not address the same "factual scenario").[13]

---

[13] The majority argues that the Court's analysis in *Dickerson* undermines my conclusion in this case, and is inconsistent with my description of the Court's practice as only applying the presumption to more serious adjudications.  *See* Maj. Op. at 37; *see also Dickerson*, 508 U.S. at 371 n.2.  In *Dickerson*, the defendant was convicted of fifth-degree possession of a controlled substance, crack cocaine, a felony in Minnesota.  *See State v. Dickerson*, 481 N.W.2d 840, 842 (Minn. 1992).  He was then sentenced pursuant to Minn. Stat. § 152.18, a diversionary scheme which permits a court not to enter a public judgment of conviction, and generally mitigates many of the collateral consequences that would otherwise flow from such a conviction.  *See Dickerson*, 508 U.S. at 371 n.2.  In assessing whether the State's appeal was moot, the Court cited to *Sibron* and observed that the reinstated judgment, though still subject to the diversionary sentence, could be used not only for various purposes in Minnesota, *see id.* (citing Minn. Stat. § 152.18(c) (noting, *inter alia*, that the record of the proceedings could be used "for purposes of a criminal investigation, prosecution, or sentencing")), but also that the Eighth Circuit had concluded that it could "be included in calculating a defendant's criminal history category in the event of a subsequent federal conviction," *id*.

The majority suggests that a presumption must apply in this case, as the specific consequences cited in *Dickerson* are arguably commensurate with those generally associated with a violation.  But in comparing the *specific* consequences Dickerson faced as a result of committing a felony with the *categorically likely* consequences of a violation-level conviction, the majority conflates two inquiries: the ex ante

19

Second, the reasoning of *Sibron* and *Spencer* confirms that this is a factual distinction with a difference — that while such a presumption might be appropriate in the context of a more serious conviction, it is not appropriate as applied to the category of judgment here. In *Sibron*, the Court "acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." 392 U.S. at 55. In justifying its approach to mootness, the Court then briefly analyzed the consequences that might flow from the defendant's conviction. In the Court's view, it was not just that the conviction could be used to impeach the defendant and for purposes of sentencing enhancement — the Court plausibly observed that "[t]here [were] doubtless other collateral consequences." *Id.* at 56. In contrast, *Spencer*, in declining to apply a presumption of collateral consequences to a parole

determination whether to apply a presumption to a category of adjudication; and the *specific* question whether such a presumption has been rebutted in a particular case. To reiterate, Dickerson was charged with and convicted of a felony. *See id*. Though the sentence in *Dickerson* might have been relevant to whether the presumption was rebutted, it did not change the answer to the ex ante question, long resolved by the Court: whether the presumption is merited as applied to a felony conviction. The majority thus tries to stack the deck, comparing the *rare* felony case, where conviction may entail few collateral consequences, with the *usual* violation. Finally, to the degree that we *were* to compare the specific consequences Dickerson faced upon reinstatement of the judgment against him with the specific consequences Nowakowski faces, it is hardly obvious, as the majority suggests, that the consequences in *Dickerson* were less severe. For various state purposes, and for federal sentencing enhancement purposes, Dickerson's criminal conviction remained a felony conviction, which could lead to mandated sentencing enhancements.

revocation, concluded that application of a presumption to such revocations, unlike application of a presumption to the convictions at issue in *Sibron* and its progeny, would not be "likely to comport with reality." *Spencer*, 523 U.S. at 12; *see also Lane*, 455 U.S. at 632-33 (distinguishing the parole revocation from the convictions in *Sibron* and *Carafas* not because the former was not "criminal" or a "conviction," but because "[n]o civil disabilities such as those present in *Carafas* result from a finding that an individual has violated parole"). The reasoning in *Spencer* — which in turn characterized the cases that came before it — was thus as follows: first, the *Sibron* presumption was justified because collateral consequences were categorically likely to flow from convictions; and second, such consequences were less likely to flow from parole revocations, rendering a parallel presumption fundamentally inconsistent with our obligations under Article III. This Court, moreover, in deciding whether to extend the presumption to a new category of judgment, has described the reasoning of *Sibron*, *Spencer*, and *Lane* in precisely this way. *See United States v. Mercurris*, 192 F.3d 290, 293 (2d Cir. 1999).[14]

---

[14] In *Mercurris*, we declined to presume the existence of collateral consequences flowing from an erroneous sentencing enhancement. 192 F.3d at 293-94. In declining to do so, the court, first, described the reasoning of *Sibron* as follows:

In light of the Court's prior holdings, and the reasoning of *Sibron* and *Spencer*, it is perfectly evident that a presumption of collateral consequences cannot logically be extended to a violation-level offense in New York. This is because the general consequences of such an offense are not only categorically less severe than the consequences logically associated with the convictions to which a presumption was applied in *Sibron* and its progeny, but *also* than those associated with parole revocations.[15] Parole revocations, after all, can result in a

> This presumption of collateral consequences has been justified on the theory that "most criminal convictions do in fact entail adverse collateral legal consequences," *Sibron*[, 392 U.S. at 55], in that convicted criminals often face certain "civil disabilities" as a result of their conviction[,] *Lane*[, 455 U.S. at 632 n.13;] . . . such [as] being "barred from holding certain offices, voting in state elections, and serving as a juror." *Id*.

*Id*. at 293. The court then observed that *Spencer* declined to apply the presumption because "parole revocations do not ordinarily result in the sort of civil disabilities that justify the presumption when dealing with a criminal conviction." *Id*. Finally, the court, analogizing to the case before it, declined to apply a presumption of such consequences in the context of sentencing enhancements. Other circuit courts have understood the methodology of *Spencer* similarly, and have engaged in the precise ex ante determination I outline herein to determine whether to extend the presumption to other categories of judgment. *See Gul v. Obama*, 652 F.3d 12, 17 (D.C. Cir. 2011) (declining to presume that collateral consequences flow from detention at Guantanamo Bay and designation as an enemy combatant, as there is "no basis for inferring [such designations] routinely have collateral consequences"); *Beachem v. Schriro*, 141 F.3d 1292, 1294 (8th Cir. 1998) (declining to presume collateral consequences both because *Spencer*'s criticism of such a presumption cautioned against extending it, and because "it is improbable that the [challenged] parole will adversely affect [the petitioner]").

[15] I do not read the majority to disagree with this factual premise, *see, e.g.*, Maj. Op. at 26 (observing that "[b]ecause Nowakowski's conviction was based on one of the

*mandated* federal sentencing enhancement. *See* U.S.S.G. § 4A1.2(k). In contrast, even assuming that the mere risk of a sentencing enhancement is sufficient to justify application of a presumption after *Lane* and *Spencer*, *cf. United States v. Dominguez-Carmona*, 166 F.3d 1052, 1059–60 (10th Cir. 1999) (Lucero, *J.*, concurring) ("[T]he Supreme Court in *Spencer*[] . . . . cast into doubt the practice of using highly speculative collateral consequences to stave off mootness . . . ."); *Mercurris*, 192 F.3d at 294 (declining to apply a presumption to a determination that a conviction is an aggravated felony, as, post-*Spencer*, "a finding of collateral consequences cannot be based on the speculation that an individual will receive an enhanced sentence in a future sentencing proceeding in connection with a

lowest level offenses under state law, we think it is likely that he will suffer fewer collateral consequences than if convicted of a felony or even a misdemeanor"), which case law also reflects, *see Meister v. N.Y. State Att'y Gen.*, No. 06-CV-0090(RJA)(VEB), 2007 U.S. Dist. LEXIS 98605, at *15 (W.D.N.Y. M.J. Sept. 6, 2007), *adopted by Meister v. N.Y. State Atty' Gen.*, 2007 U.S. Dist. LEXIS 98037 (W.D.N.Y. Sept. 26, 2007) ("In this Court's view, [the petitioner's] conviction for a 'violation' [in New York] — a less serious offense than a 'misdemeanor' — . . . cannot cause him the kind of civil disabilities identified in *Spencer*."); *cf. Gentry v. Deuth*, 456 F.3d 687, 694–95 (6th Cir. 2006) ("[T]he law does not require a habeas petitioner to prove . . . that she may face collateral consequences of her . . . felony conviction, for the disabilities consequent to a felony conviction are legion, and patently obvious in many cases" (citing *Spencer*, 523 U.S. at 8)); *Broughton*, 717 F.2d at 149 (finding that a petition challenging a misdemeanor conviction was moot upon completion of sentence because the conviction would not, *inter alia*, "prevent [the petitioner] from voting, serving on a jury, obtaining a license to practice law, becoming an official of a labor union, or qualifying for state elective office, . . . [n]or . . . expose her to the possibility of an enhanced sentence if she commits a later criminal act" (citations omitted)).

23

crime he has not yet committed"), there is minimal risk of such enhancement with prior violations, *see* N.Y. Penal Law § 70.06; U.S.S.G. § 4A1.2(c).[16]  As the majority observes, there may be some risk of impeachment associated with conviction of a violation-level offense — though only, it seems, in state criminal court.  *See* Maj. Op. at 32-33.  Even if evidence rules *permit* introduction of a violation-level conviction just as they would permit introduction of a more serious offense, however, the *risk* of impeachment actually occurring is not logically commensurate.[17]  And *Spencer* makes clear

---

[16] I do not mean to suggest that there is *no* possibility that a petitioner could face a federal sentencing enhancement on the basis of a violation-level offense generally, or Nowakowski's violation, specifically.  But in assessing whether a presumption is appropriate, it bears pointing out that under the federal Sentencing Guidelines, certain petty offenses are generally excluded from calculating a criminal history. *See* U.S.S.G. § 4A1.2(c)(1) ("Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense[.]"); *see also United States v. Morales*, 239 F.3d 113, 118-20 (2d Cir. 2000) (discussing second-degree harassment specifically).  There is thus little question that the risk of a statutory sentencing enhancement for the vast majority of such offenses is nonexistent.

[17] Thus, it seems unlikely a prosecutor would attempt to impeach a future defendant for unlawfully putting up posters on private property, s*ee* N.Y. Penal Law § 145.30, or that a court would generally permit impeachment even with an adjudication of second-degree harassment.  The New York Court of Appeals has made clear that evidence of an offense must in fact bear "logically and reasonably on the issue of credibility," and that some convictions are far more likely to bear on that issue than others — of which harassment in the second degree (and most violation-level offenses) would appear logically to be in the latter category. *People v. Sandoval*, 34 N.Y.2d 371,

that some small risk of impeachment is simply not enough to render a presumption appropriate.[18]

In short, it is not simply that a violation-level offense is factually distinct in severity from the offenses to which the Court has previously applied a presumption. It is that the *way* that such an offense, not denominated a crime in New York State, is distinct distinguishes it from those convictions and makes evident that no presumption should apply.[19] Indeed, the basic logic of applying

376-77 (1974) (noting that "[t]he commission of an act of impulsive violence . . . will seldom have any logical bearing on the defendant's credibility, veracity, or honesty . . . [in contrast to] crimes or acts of individual dishonesty, or untrustworthiness"). The majority is correct that there is some risk that *numerous prior bad acts* could be used to impeach a defendant in New York — indeed, whether or not he is convicted of a crime as a result of that act. *See id.* at 376 (referring to admission of "[e]vidence of prior specific criminal, vicious, or immoral conduct"). By the majority's reasoning, however (which deems this possibility alone sufficient to raise a presumption), *Spencer* itself should likely have come out the other way.

[18] Though *Spencer* analyzed the risk of impeachment in the context of assessing the specific harms cited by the petitioner therein (rather than in the context of a categorical assessment of whether a presumption should apply), its analysis makes evident that parole revocations generally *do* entail some risk of impeachment — certainly no less than a violation — and that this is not enough to satisfy Article III's case or controversy requirement, generally, or to support a presumption that such requirement has been met in the context of a specific category of judgment. *See Spencer*, 523 U.S. at 15-16.

[19] The majority is able to downplay the significance of New York's own designation of its offense as something other than a "crime" by resolving this case through invocation of doctrine formulated in a largely inapposite context. *See* Maj. Op. at 15-25. New York's classification of such violations as non-criminal, however — a classification that New York reflects in numerous ways throughout its statutory regime,

25

a presumption of collateral consequences to a serious conviction clearly forecloses application of such a presumption here. To the degree that the Court has "presum[e]d" significant consequences, it has done so because they are likely; and to the degree that the Court has "count[ed] collateral consequences that are remote and unlikely to occur," it has done so both because such consequences invariably sit beside other unstated, and unacknowledged *likely* consequences, and because the seriousness of the convictions at issue suggests that even consequences that may appear remote are *more* likely to occur than might be apparent. *Spencer*, 523 U.S. at 8.[20] This is not to say that application of a

---

see, e.g., N.Y. Crim. Proc. Law § 160.55 (sealing various records of such convictions as well as arrests that may have initially been for offenses actually designated "crimes"), and that is reflected in how various court decisions discuss such violations, *see, e.g.*, *Ligon v. City of New York*, 2012 WL 2125989, at *1 (S.D.N.Y. June 12, 2012) (referring to a violation as a "non-criminal offense") — while not dispositive whether violations are criminal for purposes of certain enumerated constitutional protections, is plainly relevant to whether such convictions are likely to entail significant collateral consequences as a categorical matter, *cf. A.M. v. Butler*, 360 F.3d 787, 802-03 (7th Cir. 2004) (Easterbrook, J., dissenting) (suggesting that a juvenile adjudication is not a "crime" for purposes of the *Sibron* presumption, and in particular noting that "Illinois calls it an 'adjudication' precisely so that later in life persons who violated the law can say 'no' to the question 'have you ever been convicted of a crime?'").

[20] The majority derides my focus on the likelihood of collateral consequences flowing from a category of judgment as "*Minority Report*-like," Maj. Op. at 37 n.24, but of course such an approach is routine in the context of standing and mootness inquiries, as delineation between likely and unlikely injuries, however difficult, is essential to maintaining the limitations on the jurisdiction of federal courts, *see, e.g.*, *Spencer*, 523

presumption of collateral consequences even to relatively serious adjudications does not sit "uncomfortably" beside traditional principles of Article III, as the *Spencer* majority understood. *Id.* at 10-11. But there is only limited discomfort, as long as the presumption is confined to such a context. In contrast, to apply a presumption to an adjudication like the one here is to require courts to *presume* the existence of an injury when such injury is *not likely to exist*. Applied in such a manner, the presumption becomes an arbitrary mechanism for the manufacture of cases and controversies that will inevitably require federal courts to hear cases on the merits in contravention of their obligations under Article III. That is the reasoning and sense of the cases from *Sibron* to *Spencer* — reasoning and sense from which the majority today departs.[21]

---

U.S. at 14 (referring to the use of a parole revocation in a future parole proceeding as "a possibility rather than a certainty or even a probability").

[21] The majority criticizes my approach to this inquiry, in particular suggesting that the presumption would be meaningless if we required every petitioner to demonstrate that "collateral consequences generally flow from [his] conviction before" affording him the benefit of "a presumption that assumes, as a first step subject to rebuttal, that collateral consequences generally flow from [his] conviction." Maj. Op. at 35. This criticism misstates the nature of my approach. I am not proposing a new step in mootness analysis, whereby every petitioner, including those challenging a category of judgment to which the Court has previously held a presumption to be justified, must individually prove a presumption applies. I am simply engaging in the ex ante inquiry that the majority elides: determining whether extension of the presumption to a new category of judgment would be consistent with our obligations under Article III. This

27

## C.

The majority does not necessarily dispute that, were we to assess the question on a blank slate, we might plausibly hold that extension of a presumption of collateral consequences to violation-level convictions contravenes our obligations under Article III and is inconsistent with the reasoning and outcome in *Spencer*. Instead, the majority's primary argument is that *precedent* requires application of a presumption here, because the Supreme Court used the term "criminal conviction" in cases like *Sibron* and *Spencer* without qualification, and because Nowakowski's conviction is arguably penal in character for purposes of ascertaining whether certain constitutional protections attach. *See* Maj. Op. at 14-25, 38. At the start, to the degree that there is even *doubt* that the judgment in this case was the sort contemplated by *Sibron* and *Spencer*, *Spencer*'s admonition against extending the presumption should resolve

approach, far from novel, is the very process for determining whether a presumption should apply to a new category of judgment that the Supreme Court itself employs. *See Spencer*, 523 U.S. at 12 (declining to extend the presumption to parole revocations because they are not likely to entail significant collateral consequences); *see also Mercurris*, 192 F.3d at 293-94 (using the same methodology in declining to apply the presumption to sentencing enhancements); *Gul*, 652 F.3d at 17 (using the same reasoning to not apply a presumption to designations as an enemy combatant). Indeed, in skipping this step altogether, it is the *majority* who is begging the question: the majority would require federal courts to *presume* a violation-level offense entails significant collateral consequences without once asking whether such a presumption in any sense comports with reality.

the inquiry here. Nevertheless, the majority's reading of the Court's precedent — as well its approach to explicating those holdings — is flawed on its own terms.

First, the majority's invocation of the words "criminal conviction" in precedent like *Sibron* and *Spencer* divorces these words from their factual context and thus exaggerates the scope of the Court's prior holdings. As already noted, the Court has never applied the presumption to a judgment as categorically unlikely to entail collateral consequences as Nowakowski's petty offense, nor indeed even to any *misdemeanor* conviction apart from the one in *Sibron* itself. Even if this factual consistency did not strongly indicate that a presumption should not be applied in this case, it certainly belies any suggestion that the Court, in using the term "criminal conviction" without qualification, has *already* effectively resolved the inquiry before us. *See Kokkonen*, 511 U.S. at 379 (noting that the "holding [of a prior case] was not remotely as permissive as its language," and that "[i]t is to the holdings of our cases, rather than their dicta, that we must attend"); *Powers,* 501 F.3d at 602.

Second, even if we were to treat the words "criminal conviction" as talismanic, notwithstanding the actual holdings in which such words appear,

there is still no reason to believe that the scope of this phrase includes the judgment here. The meaning of these words must be ascertained in context. *Cf. United States v. Bialsys*, 524 U.S. 666, 673 (1998) (holding that the text "any criminal case" under the Fifth Amendment's Self-Incrimination Clause does not generally include criminal cases in foreign jurisdictions, and noting that the textual argument to the contrary "overlooks the cardinal rule to construe provisions in context"). The Supreme Court has often used the short-hand "criminal conviction," moreover, when context makes perfectly clear that it can only have meant *felony* conviction or, in some cases, a serious misdemeanor. For instance, in *North Carolina v. Rice*, the Court observed, without citing *Sibron*, that "[a] number of disabilities may attach to a convicted defendant even after he has left prison, and the Court has recognized the standing of such persons to challenge the legality of their convictions even when their sentences have been served." 404 U.S. 244, 247 (1971). In a footnote, the Court then supported this statement by citing numerous consequences that would generally apply only to felonies, including disenfranchisement. *See id.* at 247 n.1 (citing, *inter alia*, Comment, Civil Disabilities of Felons, 53 Va.L.Rev. 403 (1967)). The Court

30

nowhere qualified the term conviction with the words "felony" or "serious," but no matter — the meaning was clear enough from context.

Further, in interpreting the ambit of constitutional rights, the words "criminal conviction," "crime," or "criminal prosecution" have frequently been used without qualification to announce the scope of a given right; notwithstanding such pronouncements, the Court has subsequently held that these rights do not apply to *all* criminal convictions as that term might be used in other contexts — in particular distinguishing more serious convictions from petty offenses. *See Lewis v. United States*, 518 U.S. 322, 325 (1996) (observing that, though the Sixth Amendment is clear that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury," "there is [nevertheless] a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision" (first quoting U.S. Const. Am. VI; then quoting *Duncan v. Louisana*, 391 U.S. 145, 159 (1968)); *see also Duncan*, 391 U.S. at 160 ("So-called petty offenses . . . have always been held to be exempt from the otherwise comprehensive language of the Sixth Amendment's jury trial provisions[, in part because] . . . . [t]he possible consequences to defendants from convictions for petty offenses have been thought insufficient to outweigh the

31

benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inexpensive nonjury adjudications").[22] The majority's determination that "criminal conviction" includes a low-level judgment like Nowakowski's (denominated a petty offense, and not criminal, by the State of New York) thus does not obviously flow from

---

[22] The Sixth Amendment further provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The evolution of this right, too, is instructive. In *Gideon v. Wainwright*, announcing the right to state-provided counsel for indigent defendants in the context of an appeal from a state felony conviction, the Court observed without qualification that "[t]his noble ideal [of a system of fair trials] cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him." 372 U.S. 335, 344 (1963); *see also id.* at 348 (Clark, *J.*, concurring) ("That the Sixth Amendment requires appointment of counsel in 'all criminal prosecutions' is clear, both from the language of the Amendment and from this Court's interpretation."). Nevertheless, the Court subsequently qualified that right, ultimately concluding that it did not apply in the context of *all* state criminal prosecutions. *See Scott*, 440 U.S. at 373-74 ("We . . . hold that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense."). Indeed, in *Scott*, the Court specifically noted that the project of extending its precedent was challenging, in part because of the difficulty of determining how and whether seemingly broad holdings might apply to *petty offenses*. *See id.* at 372 (observing that locating a "constitutional line" was challenging, in part because "[t]he range of human conduct regulated by state criminal laws is much broader than that of the federal criminal laws, particularly on the 'petty' offense part of the spectrum"). In light of this "range of human conduct," the Court hesitated to simply "extrapolate" from prior decisions: "[A]lthough the general nature of the principle sought to be applied [in such decisions may be] clear, its precise limits and their ramifications become less so." *Id.* After noting that the Sixth Amendment's text was not instructive, *see id.* ("We have now in our decided cases departed from the literal meaning of the Sixth Amendment."), the Court held that a line between "actual imprisonment . . . [and] fines or the mere threat of imprisonment . . . is eminently sound and warrants adoption." *Id.* at 373.

32

the Supreme Court's references to "criminal conviction" in cases like *Sibron* and *Spencer*, absent some ability to square this outcome with the context, logic, and reasoning of these decisions.

Yet the majority's approach to this inquiry fails this test. The majority concludes that the Court's references to "criminal conviction" in *Sibron* and *Spencer* necessarily require that a presumption apply whenever a conviction is functionally criminal "for purposes of determining the proper applicability of [certain] federal constitutional protections," *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 630 (1988), regardless whether collateral consequences are likely to flow from the judgment in question. But beyond the word "criminal," this approach derives no obvious support from either case. Moreover, it is an illogical — and thus extremely unlikely — approach to explicating the term "criminal conviction" as used in the context of this Article III precedent for at least two reasons.

First, the determination that a given matter should be treated as criminal for the purpose of a particular constitutional protection does not suddenly transform that adjudication *into* a criminal conviction for purposes of a state's collateral consequences regime: it does not, in other words, change the status of

33

the proceeding for purposes of enhancement provisions, impeachment laws, felony impairments, or the other collateral legal consequences animating cases like *Sibron* and *Carafas.* Indeed, it is not clear how the majority's analysis in any way illuminates the *actual collateral consequences* flowing from an adjudication. It is perhaps for this reason that the Fifth Circuit recognized in *Port v. Heard*, 764 F.2d 423 (5th Cir. 1985), in the context of discussing civil and criminal contempt, that the "mootness of contempt judgments turns, not on the formalistic enterprise of labeling the contempt judgment, but on the presence *vel non* of a live controversy." *Compare id.* at 427, *with Feiock*, 485 U.S. at 627 (assessing whether a contempt proceeding was functionally civil or criminal).

Second, the doctrine on which the majority relies is not only irrelevant to the assessment of mootness: it is, in fact, counterproductive. The analyses in cases like *Feiock* address principally the necessity of ensuring, through careful doctrinal elaboration, that states cannot evade specific constitutional criminal protections afforded to the accused through mere nomenclature — that they cannot, by denominating a proceeding or penalty as civil, for instance, evade specific criminal procedural protections that would otherwise attach. In contrast, however, a state's designation of an offense as noncriminal may often be relevant

to mootness (and indeed is relevant here), and mootness serves not as a protection afforded to individuals in the criminal process, but as a limitation on *courts*, confining the *judiciary* to its constitutionally defined role.  *See Spencer*, 523 U.S. at 11.  For these reasons, I am hard-pressed to agree with the majority that the Supreme Court intended, in using the words "criminal conviction" in the context of serious convictions, to require courts faced with difficult questions at the edge of mootness to resolve such questions not through appeal to the existence of a controversy, but through application of precedent created in an unrelated context for unrelated reasons, and that is not grounded in the animating limitations of Article III.

In short, I believe that the question whether a presumption of collateral consequences applies to a violation-level offense is an unresolved one in our jurisprudence that does not logically turn on whether or not certain constitutional protections unrelated to mootness apply.  As the question before us is thus whether to extend the presumption to a new category of adjudication, I would conclude that the presumption may not be applied to a violation for the simple reason that it does not "comport with reality" to presume that "significant

collateral consequences" will necessarily flow from such an offense across the range of cases. *Spencer*, 523 U.S. at 12.

**III.**

The preceding conclusion is sufficient to resolve this matter since, absent a presumption, the risk of impeachment in a future proceeding to which the majority alludes is clearly inadequate, under *Spencer*, to deem this a live case. *See id.* at 16 (deeming analogous risk of impeachment "purely a matter of speculation"). Even if I agreed with the majority that a presumption of collateral consequences applies, however, I believe it is also clear that the Government has rebutted it here.[23]

---

[23] As the majority observes, the overwhelming majority of courts have held that the presumption is rebuttable. *See* Maj. Op. at 29. Such courts have also held on numerous occasions that the Government successfully rebutted the presumption in the context of low-level judgments that entailed similar — if not always identical — consequences to the judgment in this case. *See e.g.*, *Puchner v. Kruziki*, 111 F.3d 541, 543 (7th Cir. 1997) ("We need not finally resolve whether a judgment of civil contempt is the kind of 'conviction' contemplated by the collateral consequences rule, however, because it is clear that Puchner's contempt order did not carry the kind of collateral consequences that allow him to escape mootness now that he is released."); *Meister*, 2007 U.S. Dist. LEXIS 98605, at *16 (recommending, after assessing the consequences that could flow from a violation-level conviction, that the court hold that "any presumption in favor of collateral consequences" that might apply to a violation-level conviction in New York "has been overcome" by the Government); *United States v. Hill*, 171 F.Supp.2d 1032, 1038, (D.S.D. 2001) (noting that a conviction for a "misdemeanor offense[] does not cause . . . the kinds of concrete disadvantages or disabilities that have been recognized as being sufficiently adverse collateral consequences to make [a] case

As an initial matter, I disagree with the majority's understanding of the standard of proof that the Government must meet to rebut the presumption. The majority observes that a petitioner may present any consequence that is "merely hypothetical and speculative," Maj. Op. at 31, and then cites language from *Sibron* that a petition is moot only if the government can show that "there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron*, 392 U.S. at 57. But if one were to take this statement — and thus this "standard of proof," Maj. Op. at 29 — *literally*, the necessary result would almost certainly be that the presumption is functionally irrebuttable.[24]

---

justiciable," and thus that "the presumption in favor of finding collateral consequences has been overcome").

[24] Scholars analyzing *Sibron* in its immediate aftermath made precisely this point — that, taken *literally*, this single sentence the majority lifts for its standard of proof would suggest that the presumption is indeed *irrebuttable* — even as other statements in *Sibron* imply that this is not so. *See Mootness in Criminal Cases*, The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 297-98 (1968) ("Given the existence of legal disabilities for convicted criminals in at least some states, a defendant's conviction would always seem to entail the possibility that he will sometime in the future suffer such disabilities."). Only one circuit has held that the presumption is irrebuttable, *see Chacon*, 36 F.3d at 1463, and that decision has garnered criticism within the Ninth Circuit that is instructive in this case, *see Larche*, 53 F.3d at 1069-70 (arguing that the *Chacon* panel's determinations that the presumption applied to misdemeanors, *and* was irrebuttable, together "completely eliminat[ed] the mootness doctrine from habeas cases," and thereby "ignored the constitutional underpinnings of the mootness doctrine, and the traditional role of the Great Writ").

The majority expressly disclaims that its presumption is irrebuttable, a conclusion it reaches, sensibly, on its reading of *Spencer*. *See* Maj. Op. at 29-30; *see also Meister*, 2007 U.S. Dist. LEXIS 98605, at *12 (observing that the "presumption [of collateral consequences] . . . should be viewed in light of the *Spencer* Court's plainly stated reluctance to find collateral consequences absent a showing of some concrete statutory disability flowing from the conviction being attacked"). Yet once one concedes, as the majority does, that this standard cannot be taken *literally and* that *Spencer* necessarily had an effect on the strength of the presumption, one is left wondering why the majority invokes the *Sibron* language at all. I believe a better view is that the Government, to rebut the presumption, need show only that there is no reasonable possibility of any *significant* collateral consequences. Such a standard comports both with *Spencer*'s express construction of the presumption, *see* 523 U.S. at 12 (referring to *Sibron* as creating a "presumption of *significant* collateral consequences" (emphasis added)), as well as with the reasoning in *Spencer* itself. And such a standard would surely require us to find *this* case moot.

Yet even if one adopts the majority's articulation of the standard, it follows that, in affirming that this presumption is *rebuttable*, the majority too is not taking

the text literally.  In other words, even as the majority cites this standard as support for its holding, it necessarily has implicitly drawn — and other courts will have to *explicitly* draw — *some line*.  To the degree then that the majority agrees that a line must be drawn — that it is not actually the case that the Government must show "no possibility [of] any collateral legal consequences" — I see no justification for the majority's conclusion that the risk of impeachment in this case should fall above that line for two reasons.

First, that risk should not be viewed in a vacuum, but in the context of the Government's broader analysis of the consequences of a violation-level offense. The majority observes that the "effect of the presumption is to accept a broader category of consequences as sufficient for purposes of avoiding mootness."  Maj. Op. at 28.  Yet to the degree that the Court has accepted speculative consequences before, it has done so in the context of more serious convictions, and in the context of a presumption whose central premise is that many consequences flow from a given conviction, even if only one or two are specifically named by the Court.  *See Sibron*, 392 U.S. at 56.  Even if the Government's categorical analysis of a violation-level offense is not enough to avoid application of the presumption, it cannot be *irrelevant* as well at the

39

rebuttal stage, and it has not been irrelevant to other courts. *See, e.g.*, *Meister*, 2007 U.S. Dist. LEXIS 98605, at \*12.

Second, even assuming a risk of impeachment in a vacuum is sufficient to create a justiciable controversy, the risk of such impeachment — though not non-existent — is substantially lower in this case than in *Spencer* or any other Supreme Court case in which the Court has cited impeachment as the material consequence.[25]  Indeed, the very fact that New York does not label violations as crimes, while not dispositive of whether such offenses are "criminal" for purposes of certain constitutional protections, is surely relevant to the likelihood that the series of discretionary decisions necessary to result in use of that conviction to impeach Nowakowski would occur.  *See Spencer*, 523 U.S. at 13. Even if the Court has accepted speculative or hypothetical consequences when assessing the consequences of convictions, that does not mean that *any* consequence, no matter *how* speculative or hypothetical, is sufficient to make a case justiciable.  If that is so, the presumption is *not* rebuttable.

---

[25] Though it is true that the risk of impeachment, generally, may have been cited in some of the *Sibron*-line cases, the *actual* risk in this case — understood in light of the nature of Nowakowski's conviction — is simply not "a consequence significant enough to have been accepted by the Supreme Court in the past."  Maj. Op. at 38.

In short, even assuming a presumption to apply, it would seem the Government has rebutted it here. In holding otherwise, I fear that the majority — even as it claims the mantle of reasonableness in suggesting that this presumption is *rebuttable* — erects a wall so high that it is only in the rarest case that the Government will ever be able to leap it. Taken by itself, such an approach to rebuttal is problematic. Viewed in concert with the majority's initial determination that a presumption may apply to an offense even when that offense is unlikely to entail significant consequences, this approach guarantees that the presumption will be applied, as it has been in this very case, in a way that invents, out of thin air, federal jurisdiction. *See Kokkonen*, 511 U.S. at 377; *Larche v. Simons*, 53 F.3d 1068, 1069-70 (9th Cir. 1995).[26]

---

[26] I note, finally, that the majority declines to decide whether the actual consequence Nowakowski cited — the effect of his extant conviction on his pursuit of damages via 42 U.S.C. § 1983 — is sufficient to make this case justiciable. *See* Maj. Op at 33 n.22. My disposition of the case necessitates reaching this question, and I would hold that it does not. Justice Scalia, writing for eight justices in *Spencer*, referred to this consequence as "a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available." 523 U.S. at 17. It is true that Justice Souter, writing for four justices, made clear his belief that *Heck* would pose no bar in any subsequent § 1983 suit. *See id.* at 21 (Souter, J., concurring); *see also id.* at 19 (noting that if *Heck* did pose a bar, that "would provide a reason, whether or not dispositive, to recognize continuing standing to litigate his habeas claim"). Yet, Justice Souter also observed that he "join[ed] the Court's opinion as well as the judgment," and specified that he joined that opinion for "an *added reason* that the Court does not reach" — that the *Heck* bar would not be present. *See id.* at 18 (emphasis added). Thus, even if there was a division on the Court as to *whether* a *Heck* bar would limit relief in a

## IV.

In light of my analysis of mootness, I would not reach the question whether Nowakowski was in custody at the time he filed his habeas petition. I note, however, that to the degree that the majority is correct that a penalty of a day of community service — and presumably commensurate penalties — may confer upon a federal district court jurisdiction to overturn a state conviction, it follows that *most* petitioners in Nowakowski's position will be seeking the writ primarily, or even exclusively, to remedy collateral consequences.[27] It is not

---

subsequent § 1983 action, a firm majority agreed that the question did not impact the justiciability of Spencer's petition. The alternative view would suggest that Justice Souter and three other justices joined two incompatible opinions — a majority opinion that expressly did *not* decide whether a *Heck* bar existed (or assumed that it did), and thus grounded its reasoning on the *irrelevance* of that bar — and a concurrence that decided no *Heck* bar existed and then grounded its conclusion on the *non-existence* of that bar. Other courts have reached a similar conclusion. *See United States v. Duclos*, 382 F.3d 62, 67 (1st Cir. 2004); *United States v. Clark*, 193 F.3d 845, 848 (5th Cir. 1999); *see also McClendon v. Trigg*, 79 F.3d 557, 559 (7th Cir. 1996) (finding that the potential of a *Heck* bar was insufficient to prevent mootness after the petitioner passed away — though the family argued that it would be barred from pursuing a § 1983 claim absent habeas); *cf. Diamond v. Charles*, 476 U.S. 54, 70 (1986) (holding that "the mere fact that continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under Art. III").

[27] I do not read the majority as holding that conditional discharge itself — *irrespective* of the specific condition attached to it — adds any material severity to a restraint on liberty for purposes of our analysis. *See* N.Y. Penal Law § 65.05(2) ("[W]hen the court imposes a sentence of conditional discharge the defendant shall be released with respect to the conviction for which the sentence is imposed *without imprisonment or probation supervision* but subject, during the period of conditional discharge, *to such*

obvious to me that this result is consistent with the Supreme Court's recognition that "[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty," *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351 (1973), and neither the Supreme Court, nor our Court, has previously found a restraint of commensurate severity to constitute custody.[28] But be that as

---

*conditions* as the court may determine." (emphases added)). Nor would such a conclusion make sense. First, though a sentencing court "*may* modify or enlarge the conditions [of conditional discharge]," *id.* (emphasis added), no such modification occurred here, and there is no reason to believe that in the ordinary case the risk of modification (coupled with the risk that the modification will result in *greater* restraints, rather than equal or even lesser ones) is a significant one, *see, e.g.*, *People v. Stefanello*, 195 Misc. 2d 262, 264 (N.Y. Cty. Ct. Ontario Cty. 2003) (observing that "[d]epending on the circumstances, *particularly the offender's conduct*, the sentence may be modified or revoked entirely and a new sentence imposed" (emphasis added)). Second, the restriction that Nowakowski not commit an additional offense (or risk revocation of his conditional discharge) does not constitute a "restraint[] not shared by the public generally." *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). And finally, a contrary determination might have the effect of elevating conditions courts have held insufficient to constitute custody above their stature. *Compare, e.g.*, *People v. Pabon*, 119 A.D.2d 446, 446 (N.Y. App. Div. 1st Dep't 1986) (assessing a sentence in which the sole condition was that the defendant could not reapply for a driver's license); *with Lillios v. New Hampshire*, 788 F.2d 60, 61 (1st Cir. 1986) (per curiam) (holding that suspension of a driver's license was not a sufficient deprivation of liberty to render a defendant in custody).

[28] *See Jones*, 371 U.S. at 242 (holding parole supervision to be custody); *Hensley*, 411 U.S. at 351 (finding custody where petitioner's "freedom of movement rest[ed] in the hands of state judicial officers, who [could] demand his presence at any time and without a moment's notice"; where he was free from "incarceration" only by virtue of a stay; and where he faced the imminent threat of future incarceration); *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 301 (1984) (finding custody, in the context of a Double

it may, if habeas, an "extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism," *id.*, has transformed, for some petitioners, from a remedy of severe deprivations of liberty to a mere tool through which a petitioner may challenge the collateral consequences of a conviction or adjudication, then it is all the more important that we ensure that the petition presents a live case or controversy when analyzing those collateral consequences.

I respectfully dissent.

---

Jeopardy case, where the petitioner faced "[the] obligation to appear for trial in the jury session on the scheduled day and also 'at any subsequent time to which the case may be continued'" (quoting Mass.Gen.Laws Ann., ch. 278, § 18 (West 1981)); the requirement to "not depart without leave" (quoting *id.*); and the imminent threat of two years' incarceration should he fail to appear at the trial); *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 895 (2d Cir. 1996) (finding the threat of permanent banishment from a reservation sufficient to render the petitioners in custody); *compare Shenandoah v. U.S. Dep't of Interior*, 159 F.3d 708, 714 (2d Cir. 1998) (finding the petitioners not in custody where they alleged, *inter alia*, that they had been "denied admittance into the Nation's health center, . . . [and] banned from various businesses and recreational facilities"); *see also Poodry*, 85 F.3d at 895 (suggesting that the placement of a penalty in the hierarchy of a state's penalty-scheme is relevant to its severity). Further, the majority's conclusion that *duration* is in all cases irrelevant to the level of severity imposed by a penalty, *see* Maj. Op. at 10, does not seem obvious. Indeed, it may be that at times one *must* recognize duration to fully understand the *severity* of a restriction on liberty. *See, e.g., Poodry*, 85 F.3d at 895 (discussing *permanent* banishment); *see also Lydon*, 466 U.S. at 301 (noting that the petitioner was "under an obligation to appear for trial in the jury session on the scheduled day *and also* 'at any subsequent time to which the case may be continued'" (quoting Mass.Gen.Laws Ann., ch. 278, § 18 (West 1981))(emphasis added)).